**NATIONAL ANTI–HUNGER COALITION, et al., Plaintiffs,**

v.

**EXECUTIVE COMMITTEE OF the PRESIDENT'S PRIVATE SECTOR SURVEY ON COST CONTROL, et al., Defendants.**

**Civ. A. No. 82–3592.**

United States District Court,
District of Columbia.

Feb. 24, 1983.

Eric R. Glitzenstein, Alan B. Morrison, David C. Vladeck, Jack Stolier, Cynthia G. Schneider, Washington, D.C., for plaintiffs.

Richard K. Willard, Barbara L. Gordon, Surell Brady, Dept. of Justice, Washington, D.C., for defendants.

### MEMORANDUM

GESELL, District Judge.

This case comes before the Court on cross-motions and requires the Court to interpret the application of the Federal Advisory Committee Act, 5 U.S.C.App. I, as it impinges on an advisory committee survey now being conducted for the President at his request.

On February 18, 1982, President Reagan announced his intention to establish a "Private Sector Survey on Cost Control in the Federal Government." Its purpose was to call on the expertise of "leaders from the business, labor, and academic communities" to obtain detailed management and cost control advice with a view towards reducing runaway costs in the federal sector.[1]

---

**1.** July 15, 1982, White House Press Release at 2, attached to plaintiffs' motion for a prelimi- nary injunction, filed December 22, 1982.

By Executive Order No. 12369, 47 Fed. Reg. 28899 (June 30, 1982), the President established the Executive Committee of the Private Sector Survey. The Executive Committee was to be composed of no more than 150 citizens appointed by the President from the private sector.[2] It was to conduct in-depth reviews of Executive branch operations and to advise the President, the Secretary of Commerce and the heads of other federal agencies.

The Executive Order also provided that "[t]he Committee is to be funded, staffed and equipped ... by the private sector without cost to the Federal Government." *Id.* To implement this objective, the Foundation for the President's Private Sector Survey on Cost Control was established. The Foundation, a non-profit corporation of the District of Columbia, made an agreement with the Secretary of Commerce on July 7, 1982, under which it was to provide assistance to the Committee including facilities and staff support. The Foundation's Management Office has organized thirty-six "task forces," each co-chaired by two or more members of the Committee, to do the "preliminary work of the survey, including fact-gathering, statistical evaluations, and the formulation of preliminary reports."[3] Twenty-two of the task forces are assigned to study particular agencies, and the remaining fourteen are studying cross-agency functions. Apart from the chairmen, none of the task force members are members of the Committee, nor do the task forces have any authority to make recommendations to agencies or to the President.

Plaintiffs are individual recipients of federal food assistance benefits and the National Anti-Hunger Coalition, a group whose primary objective is "alleviation of hunger and malnutrition in this country through the participation of poor persons in policy decisions which affect their lives." Plaintiffs' memorandum filed December 22, 1982, at 6. Because of their concern that the Survey's submissions to the Committee may affect benefits available under federal food assistance programs, plaintiffs first sought access under the Federal Advisory Committee Act (FACA), 5 U.S.C.App. I, § 10, to all documents being generated by three task forces reviewing federal feeding programs. That access was denied and this suit followed.

Plaintiffs allege that the Survey is in violation of the FACA because the membership of the Executive Committee is not "balanced," as required by that Act, and because the task forces are "subcommittees" covered by the Act and consequently must give plaintiffs access to their documents and permit plaintiffs to participate in task force meetings and activities being conducted to develop initial proposals for the Survey. Plaintiffs seek a preliminary injunction granting full relief and defendants in turn have filed a motion to dismiss alleging that plaintiffs lack standing under the FACA and asserting that in any case neither the Executive Committee nor the task forces are operating in violation of that Act. Depositions have been taken and affidavits and documents filed. The parties have agreed the motions should be treated as cross-motions for summary judgment and after full argument and briefs the matter is ripe for determination.

I. *The Federal Advisory Committee Act*

The FACA defines an "advisory committee" as follows:

The term "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereafter in this paragraph referred to as "committee"), which is—

(A) established by statute or reorganization plan, or

(B) established or utilized by the President, or

---

2. The President increased the size of the Committee to not more than 170 members by Executive Order 12398, 48 Fed.Reg. 377 (January 5, 1983).

3. Affidavit of Kenneth Millian at 6, 7, filed with defendants' motion to dismiss, January 20, 1983.

(C) established or utilized by one or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, . . . .

5 U.S.C.App. I, § 3(2).

All advisory committees meeting this definition are subject to numerous requirements. Committee meetings must be open to the public, notice of meetings must be published in the *Federal Register,* and all records, reports, and other documents generated by the committee must be open to public inspection. 5 U.S.C.App. I, § 10. There is also a requirement that membership of the committee be "balanced in terms of the points of view represented." 5 U.S.C.App. I, § 5(b)(2).

## II. *Standing*

■ Defendants at oral argument acknowledged that, under several recent cases in this Circuit, plaintiffs have standing to challenge violations of § 10 of the FACA, which outlines required advisory committee procedures such as open meetings, access to documents and records, and so forth. The requirement of "balanced" membership, however, occurs in § 5 of the Act. Because no court has actually granted standing under that section, defendants still argue that no judicial review is available as to that section. In *Physician's Education Network, Inc. v. HEW,* 653 F.2d 621, 622–23 (D.C.Cir. 1981), this Circuit dealt with a plaintiff alleging unbalanced membership under § 5 of the FACA. In dicta, the court noted that a plaintiff denied actual representation on an advisory committee would have standing under the FACA. The Court's discussion of standing made no distinction between requirements under § 5 and re-

quirements under § 10 of the Act. Nor is any distinction readily apparent to . this Court. Under the circumstances of this case plaintiffs will be granted standing to challenge committee membership as well as to question the committee's compliance with the procedural requirements of the Act.[4]

## III. *The Executive Committee*

■ As defendants concede, the Executive Committee is subject to the Act's requirements. Defendants allege, and plaintiffs do not dispute, that the Executive Committee has complied and will comply with the procedural requirements found in § 10 of the Act. The Executive Committee has already held an open, public meeting on February 4, 1983, in full accordance with FACA requirements. A subcommittee consisting of 30 committee members, also subject to FACA requirements, was created at that meeting to conduct a series of further public meetings commencing in March of 1983 at which the subcommittee will consider findings and recommendations drafted by task forces and cleared through the Management Office of the Foundation. Those findings and recommendations will be available to the public for written comments at least two weeks before they are considered at a meeting of the subcommittee. After reviewing the task forces' material and the public comments thereon the subcommittee will formulate recommendations to be sent to the President. The full Executive Committee will be reconvened, again in accord with the FACA, to formulate a summary recommendation which will also be sent to the President. There is no dispute that plaintiffs will be able to participate in the Executive Committee's and

---

**4.** Plaintiffs have also alleged a cause of action against defendants under the Administrative Procedure Act (APA), 5 U.S.C. § 706, apparently to support their view that judicial review of defendant's actions is available. Plaintiffs' memorandum in opposition to defendants' motion to dismiss, filed February 4, 1983, at 12. In particular, plaintiffs allege that defendant Department of Commerce has acted arbitrarily and capriciously because the Committee and

task forces do not have a "balanced" membership as required by the FACA and Commerce's implementing guidelines. Because the Court finds that plaintiffs have standing it is not necessary to address the issues of whether plaintiffs have a cause of action under the APA and whether the events complained of constitute "agency action" reviewable under its provisions.

subcommittee's formulation of recommendations.

■ In addition to these procedural requirements, however, § 5 of the FACA also requires that "the membership of the advisory committee ... be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C.App. I, § 5(b)(2). Plaintiffs contend that the Executive Committee is not, in fact, "balanced." They note that virtually all of the Committee members are executives of major corporations; one is from the labor community, and two are academics. They urge a lack of balance because there are no public interest advocates and no beneficiaries of federal food assistance programs such as the individual plaintiffs among the Committee's membership.

Nowhere in the FACA is the meaning of the term "balanced" explained. Interpreted most broadly, it would take far more than a mere 150 individuals to ensure that every point of view concerned with the financial administration of federal programs be represented. Congress implicitly recognized the unworkability of such a requirement when it described "balanced" in terms of "the functions to be performed by the advisory committee."

In this case, the function to be performed by the Private Sector Survey is narrow and explicit. The President's express intent in establishing the survey was to apply to federal programs the expertise of leaders in the private sector with "special abilities to give detailed advice on cost-effective management of large organizations." White House Press Release, *supra,* at 1. In order to accomplish this objective, the President of necessity gathered the Committee members not from the public at large, but from the private sector. He selected those who have experience in the fiscal management of large private organizations. Surely Congress did not intend to prohibit the President from seeking specialized advice and while one may speculate that different choices might have been made to accomplish the President's objective the simple gathering of a discrete group of experts in a particular narrow field is not in itself enough to render such an advisory committee unbalanced in the sense of the FACA.[5]

The "imbalances" to which plaintiffs point are, in fact, simply irrelevant to the ability of the Executive Committee to perform its limited function fairly and impartially. To require the Committee to contain members of public interest groups or members of the public receiving federal benefits would operate not to "balance" viewpoints but to change the cost-control function of the "private sector" survey. Plaintiffs have failed to demonstrate any imbalance in the Executive Committee within the meaning of the FACA. Thus it is unnecessary to confront plaintiffs' far-reaching suggestion that Congress contemplated that the courts

---

**5.** Plaintiffs have alleged that the Committee has departed from its narrow mandate and in fact is researching and considering substantive changes in federal programs. The sole support for this contention is the affidavit of Robert Greenstein, the director of a private consulting organization, who claims that some members of a task force met with him to discuss entitlement programs and "clearly indicated in the conversation that [they] were looking at basic policy changes involving benefit levels in programs such as food stamps, as well as management and administrative issues." Affidavit of Robert Greenstein at 2, attached to plaintiffs' motion for a preliminary injunction, filed December 22, 1982. The remarks and opinions of a task force member, speaking with a private consultant, are not enough to indicate that the task forces are in fact developing recommendations for substantive program changes. Deposition testimony taken by plaintiffs suggests that task force members in fact regard their role as one of administrative and management experts only. *See* Deposition of John Bode, filed February 10, 1983, transcript at 45 (Bode tr.); Deposition of Mary Jarratt, filed February 10, 1983, transcript at 5 (Jarratt tr.); and Deposition of Richard W. Strauss, filed February 10, 1983, transcript at 46 (Strauss tr.). More importantly, the task forces completely lack any authority to recommend substantive policy changes and there is no indication that either the President or any agency would solicit or accept the views of a task force member on any substantive issues.

should be placed in the role of reviewing the President's choice of advisors.[6]

## IV. The Task Forces

 Plaintiffs further allege that the task forces utilized by the Foundation, as described earlier, are "advisory committees" under the FACA and therefore also subject to the same procedural requirements as the subcommittee and the Committee itself. The Court, however, agrees with defendants that the task forces are not subject to FACA requirements. They do not directly advise the President or any federal agency, but rather provide information and recommendations for consideration to the Committee. Consequently, they are not directly "established or utilized" by the President or any agency "in the interest of obtaining advice or recommendations." 5 U.S.C.App. I, § 3(2).

There is no question that the task forces are intimately involved in the gathering of information about federal programs and the formulation of possible recommendations for consideration of the Committee. That is not enough, however, to render them subject to the FACA. The Act itself applies only to committees "established or utilized *by*" the President or an agency "in the interest of obtaining advice or recommendations *for* the President or one or more agencies." 5 U.S.C.App. I, § 3(2) (emphasis added). The Act does not cover groups performing staff functions such as those performed by the so-called task forces.

The task forces at issue do not provide advice directly to the President or any agency, but rather are utilized by and provide advice to only the Executive Committee, which then provides advice to the Presi-dent or agency. The distinction is not just a semantic one.[7] Before the Committee can produce final recommendations, it must gather information, explore options with agencies to get comments and reactions, and evaluate alternatives. Plaintiffs admit that, under their proposed interpretation of the Act, the procedural requirements of the FACA would apply to these preliminary actions. But surely Congress did not contemplate that interested parties like the plaintiffs should have access to every paper through which recommendations are evolved, have a hearing at every step of the information-gathering and preliminary decision-making process, and interject themselves into the necessary underlying staff work so essential to the formulation of ultimate policy recommendations. The language of the statute itself distinguishes between advisory committee members and advisory committee staff. *Compare* 5 U.S.C. App. I, § 5(b)(2) *with* § 5(b)(5). Staff would be expected to perform exactly the sort of functions performed by the task forces at issue—gathering information, developing work plans, performing studies, drafting reports and even discussing preliminary findings with agency employees.

There is no reliable evidence that the task forces at issue have gone beyond such functions and have actually started advising agencies on policy recommendations. If the task forces were in fact providing advice directly to agencies, they might indeed be functioning as advisory committees within the meaning of the Act. However, not only do the task forces lack authority to do this but plaintiffs have wholly failed to demonstrate by deposition or otherwise that such is the case. Defendants, challenging plaintiffs' assertion, point to depositions taken

6. It is also unnecessary to reach defendant's argument that, because the requirement of balanced membership is described in the FACA as a "guideline" which "shall be followed by the President" to the extent it is "applicable," 5 U.S.C.App. I, § 5(c), it in fact imposes no requirement of compliance on the President and is merely hortatory.

7. See *Lombardo v. Handler,* 397 F.Supp. 792 (D.D.C.1975), *aff'd without opinion,* 546 F.2d 1043 (D.C.Cir.1976), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 248 (1977). In that case, the Environmental Protection Agency entered a contractual relation with the National Academy of Sciences under which the Academy conducted certain studies. The academy in turn relied on its Committee on Motor Vehicle Emissions (CMVE). The CMVE was held not to be a committee subject to FACA in part because "it appears that the E.P.A. is "utilizing" the Academy itself, and not the C.M.V.E." *Id.* at 800).

during the course of plaintiffs' discovery which suggest that the task force members in fact were not advising agencies and were completely aware they lacked authority to do so. The depositions also suggest that the agency employees meeting with the task force members did not regard their discussions as advisory and had no intention of taking any action based on those discussions. Bode tr. at 26, 28, 53–57, 50; Jarratt tr. at 28, 34–36; Strauss tr. at 53–58. In sum, plaintiffs have completely failed to introduce any evidence suggesting that the task forces are in fact operating in an advisory capacity rather than simply providing information and draft proposals to the Executive Committee.

## V. *Conclusion*

It is clear that Congress in passing the FACA wished to create some controls and standards governing the advisory committee process, to control the proliferation and expense of such committees and to ensure that Congress and the public retain access to information regarding their number, membership and activities. 5 U.S.C.App. I, § 2. However, the statute that resulted is another example of unimpressive legislative drafting. It is obscure, imprecise, and open to interpretations so broad that in the present context at least it would threaten to impinge unduly upon prerogatives preserved by the separation of powers doctrine. Not surprisingly, litigants seize on such uncertainties and may try to press statutory claims beyond constitutional boundaries. The courts do not welcome their role in such disputes. Many with considerable merit on their side criticize the involvement of federal courts in matters of this kind although the fault lies primarily with congressional drafting. If more expertise were applied to such enactments to ensure that Congress states with more precision what it intends, the rules of the game would be more sharply drawn and court involvement could be less.

The present controversy is a good example of this phenomenon. The Act leaves a myriad of questions unanswered, especially concerning the extent to which Congress intended to interfere with the President's formulation of policy. A President constantly seeks, as he should, informed advice. His choice of advisors should be largely his personal concern under our tripartite form of government.

The Court's task in the absence of clear indications in the statute or its legislative history to the contrary must be to achieve a common-sense interpretation. Congressional concerns must be accommodated in a manner that produces a constitutional result, in this instance to leave the President with substantial freedom to formulate policy recommendations free from excessive intrusion. If the Act were interpreted as plaintiffs suggest the effort of the President to seek fiscal advice from the private sector would come to a total halt and the attempt to formulate efficient fiscal management of the government would bog down in a plethora of hearings, demands for document access and increasing time-consuming litigation. In the context of this case, the language of the statute reviewed in light of those concerns demands that this Court grant summary judgment for defendants and deny plaintiffs relief.

The Court holds that the Executive Committee is balanced within the meaning of the Act and the task forces are not subject to the Act's procedural requirements because the task forces are not utilized by the President or the agencies for advice or recommendations. Defendants' motion to dismiss is granted and the complaint is dismissed.