**ASSOCIATION OF AMERICAN PHY-SICIANS AND SURGEONS, INC., et al., Plaintiffs,**

v.

**Hillary Rodham CLINTON, et al., Defendants.**

**Civ. A. No. 93–0399 (RCL).**

United States District Court, District of Columbia.

March 10, 1993.

Kent Masterson Brown, Christopher J. Shaughnessy, Brown & Brown, P.S.C., Lexington, KY, Alan P. Dye, Frank M. Northam, Werster, Chamberlain & Bean, Washington, DC, for plaintiffs.

David J. Anderson, Elizabeth A. Pugh, Jeffrey S. Gutman, Dept. of Justice, Civ. Div., Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case raises one of the most difficult issues faced by the judiciary: the separation of powers between the legislative and executive branches of government. The case comes before the court on plaintiffs' motion for a temporary restraining order and a preliminary injunction ("Plaintiffs' Motion"); defendants' motion to dismiss or, in the alternative, for summary judgment ("Defendants' Motion"), and plaintiffs' memorandum in opposition to defendants' motion and in support of plaintiffs' motion ("Plaintiffs' Reply"). The issues have been fully briefed and eloquently argued in open court. For the reasons given below, plaintiffs' motion shall be granted in part and defendants' motion shall be granted in part.

## I. INTRODUCTION AND BACKGROUND.

President Clinton promised the American people during the recent campaign that he would address the problem of health care in this country. Although expenditures on health care are rapidly approaching $1 trillion a year and quickly outpacing inflation, dissatisfaction with the present system of administering medical care infects the nation.

Thus, on January 25, 1993, President Clinton announced the creation of the President's Task Force on National Health Care Reform, an advisory body comprised of six Cabinet secretaries, several senior White House officials, and the chairperson, First Lady [1] Hillary Rodham Clinton. The President charged the Task Force with presenting him with a health care reform proposal he could present to Congress; the time limit was set at 100 days. At the same press conference, the President also announced the formation of an inter-departmental working group, comprised of more than 300 federal employees, which is charged with gathering and analyzing the information on which the Task Force will rely in formulating its proposal. The record indicates that the Task Force has yet to meet (with the exception of the January 25 photo opportunity), but the working group has been active, meeting with private individuals and representatives of private organizations; these meetings have not been open to the public. The Task Force's plans are to hold some, but not all, of its meetings in public.

Plaintiffs are three not-for-profit corporations: Association of American Physicians and Surgeons, Inc., represents physicians and osteopaths; American Council for Health Care Reform represents health care consumers; and National Legal & Policy Center seeks to promote ethics in government. Each has sought to gain admittance to all meetings of the Task Force, claiming that § 10 of the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. 2 §§ 1–15, mandates that such meetings be open to the public. Plaintiffs' claim is founded on the proposition that since the First Lady is not a federal employee, the Task Force falls within the definition of an advisory committee set forth in § 3 of FACA. *See* Part III.A.3., below. Each

plaintiff subsequently received word from Bernard W. Nussbaum, counsel to the President, that FACA did not apply to the Task Force, but that private citizens would be allowed to take part in some of the Task Force meetings.

Faced with exclusion from some of the meetings, the plaintiffs brought this suit. They seek a temporary restraining order and a preliminary injunction which would bar the defendants from convening a meeting of the Task Force or any subgroup or subcommittee thereof without first meeting the requirements of FACA. Defendants have opposed this suit and moved to dismiss or, in the alternative, for summary judgment. They claim (1) that FACA does not apply to the Task Force; and (2) that even if FACA does apply to the Task Force, that application would violate article II, section 3 of the Constitution. The court will address each of these questions in Part III., below.

## II. STANDARDS FOR A PRELIMINARY INJUNCTION.[2]

A preliminary injunction may be granted in this circuit only when the plaintiffs demonstrate that they have met the four-part test of *Washington Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843 (D.C.Cir.1977):

1. that they have a substantial likelihood of success on the merits;

2. that irreparable injury will result in the absence of a preliminary injunction;

3. that no other parties will be harmed if the injunction is entered; and

4. that the public interest favors entry of the injunction.

The court finds that each of these is present.[3] The discussion of the first criteria,

---

1. Although Congress uses the term "spouse of the President," 3 U.S.C. § 105(e), both plaintiffs and defendants use the traditional term "First Lady." The court therefore will adopt their usage.

2. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Defendants have not questioned plaintiffs' standing. Regardless, in light of the Supreme Court's decision in *Pub-*

*lic Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), any objections would be overruled. Therefore, this case and these parties are properly before the court.

3. Typically, the district court must balance these factors in order to determine whether an injunction should issue. *See, e.g., Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 151–52

likelihood of success on the merits, is contained in Part III., below. The remaining three aspects of the *Holiday Tours* standard are addressed in Part IV.

## III. LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. *FACA Applies to the Task Force.*

#### 1. *FACA's Definition of an Advisory Committee.*

The Federal Advisory Committee Act was passed in 1972 with two explicit goals in mind: first, to eliminate unnecessary advisory committees and ensure that future committees be properly justified; and second, to increase the accountability of advisory committees by opening their meetings to the general public and forcing disclosure of their purposes, memberships, costs, and activities. FACA § 2. To this end, Congress imposed several requirements upon the executive branch and most of its advisory committees. These include the filing of a charter (§ 9), timely publication of all advisory committee meetings (§ 10(a)(2)), public participation (§ 10(a)(3)), and disclosure of proceedings (subject to the limited exceptions of the Government in the Sunshine Act (5 U.S.C. § 552b)) (§§ 10(b), (c), and (d)).[4]

Section 3(2) provides the definition of an advisory committee:

any committee, board, commission, council, conference, panel, *task force*, or other similar group, or any subcommittee or other subgroup thereof ... which is ...

(B) established or utilized by the President

... in the interest of obtaining advice or recommendations for the President or

one or more agencies or officers of the Federal Government....

5 U.S.C.App. 2 § 3(2) (emphasis added). The definition section then proceeds to exclude from FACA's coverage two enumerated commissions and "(iii) any committee which is composed wholly of full-time officers or employees of the Federal Government."

Plaintiffs argue that the First Lady is not a federal officer or employee; thus, the court should hold that FACA governs the operations of the Task Force. Defendants counter by invoking the legislative intent of Congress—limiting the pernicious influence of "outsiders" on the workings of federal government—and suggest that the court should view Mrs. Clinton as the "functional equivalent of a federal employee." Defendants' Motion at 20.

At issue, therefore, is the definition of the words "officer" and "employee."

#### 2. *Avoiding the Constitutional Question.*

Defendants contend, and the court acknowledges, that plaintiffs' reading of FACA—and their literal reading of the words "officer" and "employee"—raises the constitutional issue of the power of Congress to regulate the power of the President.[5] Therefore, the first task of the court is to determine whether some plausible interpretation of these terms will obviate the need to examine the constitutional question. As the Supreme Court has frequently stated, "it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct.

(D.C.Cir.1985). However, since the court finds below that plaintiffs have met each of these criteria, the court need not perform this balancing.

**4.** Defendants acknowledge that these requirements apply to all advisory committees. Defendants' Motion at 11 n. 5.

**5.** That this is a serious constitutional question cannot be disputed. Defendants note (Defendants' Motion at 26) that the five-justice majority in *Public Citizen* regarded the constitutional question as "serious" and "undeniable." 491 U.S. at 466–67, 109 S.Ct. at 2572–73. (Through

the use of statutory construction, however, the Court was able to avoid the constitutional issues.) Three justices (Justice Kennedy writing for himself as well as Chief Justice Rehnquist and Justice O'Connor) concurred in the judgment and said that, in their view, FACA was unconstitutional as a violation of separation of powers principles when applied to the facts in that case. 491 U.S. at 482–89, 109 S.Ct. at 2580–84. Justice Scalia took no part in the case, and Justices Souter and Thomas have since replaced two of the members of the *Public Citizen* majority.

285, 296, 76 L.Ed. 598 (1932) (footnote omitted).

Therefore, the court's first task is to determine whether defendants' proposed definition of "officer" and "employee," although seemingly contrary to the language of Title 5 of the United States Code, is "fairly possible." If so, the Task Force would be exempted from FACA's requirements, and the constitutional question could be avoided.

3. *The Definition of "Employee."*

■ FACA is not a model of legislative drafting,[6] and the court has several models to follow in its attempt to construe the statute so as to avoid any constitutional issues. For instance, and most importantly, in *Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), the Supreme Court examined the word "utilized" in § 3 of FACA to determine whether the American Bar Association's Standing Committee on the Judiciary, which has for several decades provided the Department of Justice with a ranking on all proposed nominees for federal judgeships, qualified as an advisory committee subject to FACA's strictures. Justice Brennan, all the while acknowledging that he was rejecting "one common sense of the term [utilize]," 491 U.S. at 452, 109 S.Ct. at 2565, proceeded to utilize legislative history in order to find that the Department of Justice did not "utilize" the ABA Standing Committee when it "utilized" it. As the Court noted, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." 491 U.S. at 466, 109 S.Ct. at 2572. In *Public Citizen,* the Court was successful in construing the statute in such a fashion and it thereby avoided having to address the constitutional question.[7] Similar techniques of statutory construction are found in *National Resources Defense Council v. Herrington,* 637 F.Supp. 116 (D.D.C.1986), and *Nader v. Baroody,* 396 F.Supp. 1231 (D.D.C.1975).

Although the court believes there was little ambiguity in the word "utilize" prior to the Supreme Court's holding in *Public Citizen,* the court will nonetheless accept that Court's determination that "utilize is a woolly verb, its contours left undefined by the statute itself." 491 U.S. at 452, 109 S.Ct. at 2565. However, the terms "officer" and "employee" are shorn of all such ambiguity, and Congress has precisely determined their meanings.

Neither "officer" nor "employee" is included in the definitions section of FACA (§ 3); in fact, in all fifteen sections of FACA, Congress gave absolutely no description or gloss as to who qualifies as "full-time officers and employees of the Federal Government." Of course, the reason for this glaring omission is evident: Congress already had provided, in §§ 2104 and 2105 of Title 5, complete definitions for both words. In relevant part, those sections provide as follows:

*Section 2104—Officer*

(a) For the purpose of this title [Title 5], "officer," except as otherwise provided by this section or when specifically modified, means a justice or judge of the United States and an individual who is—

(1) required by law to be appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a court of the United States;

(C) the head of an Executive agency; or

---

**6.** One of the most vehement critics of FACA was the late Judge Gerhard Gesell, who consistently decried the ambiguity of the statute. *See, e.g., National Anti–Hunger Coalition v. Executive Committee,* 557 F.Supp. 524, 530 (D.D.C.), *aff'd,* 711 F.2d 1071 (D.C.Cir.1983); *Nader v. Baroody,* 396 F.Supp. 1231, 1232 (D.D.C.1975).

**7.** District Judge Joyce Hens Green, whose decision was directly appealed to the Supreme Court, had noted that the definition of "utilize" ultimately adopted by the Supreme Court pushed statutory construction to the extreme and was therefore not fairly plausible. She thus held that FACA did apply to the Standing Committee. *Washington Legal Foundation v. U.S. Dep't of Justice,* 691 F.Supp. 483, 491 (D.D.C. 1988).

(D) the Secretary of a military department;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; *and*

(3) subject to the supervision of an authority named by paragraph (1) of this section, or the Judicial Conference of the United States, while engaged in the performance of the duties of his office....

*Section 2105—Employee*

(a) For the purpose of this title [Title 5], "employee," except as otherwise provided by this section or when specifically modified, means an officer and an individual who is—

(1) appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a Member or Members of Congress, or the Congress;

(C) a member of a uniformed service;

(D) an individual who is an employee under this section;

(E) the head of a Government controlled corporation; or

(F) an adjutant general designated by the Secretary concerned under section 709(c) of title 32;

(2) engaged in the performance of a Federal function under authority of law or an Executive act; *and*

(3) subject to the supervision of an individual named by paragraph (1) of this section while engaged in the per-

formance of the duties of his position....

5 U.S.C. §§ 2104 & 2105 (emphasis added). These sections apply to FACA, and it is apparent that Mrs. Clinton meets neither definition. First, Mrs. Clinton is not appointed to the civil service. Second, the President was not required by law to appoint Mrs. Clinton to the civil service when he named her to lead the Task Force. In addition, defendants provide no evidence of other indicia of employment within the Government, such as the filing of a Form 50 or the taking of an oath of office. In short, the statutory language is—unlike that of FACA—exceedingly clear, and Mrs. Clinton simply does not satisfy either definition.[8]

Despite the long-accepted maxim that the plain language of a statute should control the court's determination, defendants argue that the court nonetheless should examine the legislative history of FACA. Defendants contend that Congress' purpose in enacting FACA was essentially to ensure that "outsiders"—those with private interests—could not advise the federal government without the openness provisions required by FACA. On the other hand, "insiders"—government employees with no self-interested motivations—did not need further public scrutiny; thus, defendants conclude, Congress exempted advisory committees comprised wholly of these insiders from FACA's strictures.[9] Using this reasoning, the defendants assert that the First Lady is just such an insider as she represents no private interests; she is, in effect, the "functional equivalent of a federal employee." Defendants also assert

---

**8.** Plaintiffs also urge the court to hold that the Kennedy Act, 5 U.S.C. § 3110, similarly precludes a finding that Mrs. Clinton is an employee of the Federal Government. This anti-nepotism statute precludes the spouse of the President from being an officer or employee of the Federal Government. Defendants contend that the statute does not apply. As the court finds that the clear language of §§ 2104 and 2105 are sufficient to establish the fact that the First Lady is neither an officer nor an employee, the court need not address this issue.

**9.** The government raised a similar theory while defending *Washington Legal Foundation v. U.S. Dep't of Justice,* 691 F.Supp. 483 (D.D.C.1988).

In that case, however, the government took the position that Congress's intent in FACA was to expose to the light of public scrutiny the activities of "private special interests' groups," 691 F.Supp. at 489, a group the court presumes can be likened to the "outsiders" attacked in this proceeding. The *Washington Legal Foundation* court, however, did not accept the government's argument because such an interpretation worked too much violence on the plain language of the FACA statute. The court today is faced with language that is even less open to interpretation, and the court thus does not adopt defendants' legislative history arguments.

that this conclusion is bolstered by the fact that Congress has appropriated funds for the spouses of the President and the Vice President and their staffs so that they might perform their government-related functions. 3 U.S.C. §§ 105(e) & 106(c).

The court disagrees with defendants' position. First, although it exempted particular bodies from FACA, Congress did not exclude the First Lady; nor did it then decree (and it has not decreed since) that the President's spouse qualifies as an employee—or even a "quasi-employee"—of the federal government. Second, Congress did not legislate a distinction between "insiders" and "outsiders," but rather between "full-time officers and employees of the Federal Government" and those who do not meet the definitions provided in 5 U.S.C. §§ 2104 and 2105. Third, no court has "held that an [individual's or] advisory group's civic, benign, or neutral motives place it beyond the statute's reach." *Washington Legal Foundation,* 691 F.Supp. at 490. In short, defendants' analysis of the legislative intent of FACA is not persuasive.

#### 4. The Interdepartmental Working Group.

■ Plaintiffs have also asserted that the interdepartmental working group [10] is an advisory committee to the Task Force and therefore is similarly subject to FACA. Although the court's resolution of the question of the applicability of FACA to the Task Force would seem to resolve this issue in favor of plaintiffs, particularly as defendants have admitted that the working group is meeting with private citizens, the question is significantly more difficult.

Unlike the issue addressed in Part 3., however, this is not a question of first impression for the court. The framework for the court's discussion is provided by *National Anti–Hunger Coalition v. Executive Committee,* 557 F.Supp. 524 (D.D.C.), *aff'd,* 711 F.2d 1071 (D.C.Cir.1983) *("NAHC").* In that case, President Reagan had created by Executive Order a 150–

member Executive Committee comprised almost entirely of representatives of the private sector; FACA clearly applied to this body. Supporting the Executive Committee were thirty-six task forces, each chaired by members of the committee. Plaintiffs brought suit and demanded that FACA's requirements be imposed upon the task forces as well. Judge Gesell dismissed plaintiffs' claims, finding that the task forces

> do not directly advise the President or any federal agency but rather provide information and recommendations for consideration to the Committee. Consequently, they are not directly 'established or utilized' by the President or any agency 'in the interest of obtaining advice or recommendations.'

557 F.Supp. at 529. Likening the task forces to staff, the court commented that "[s]taff would be expected to perform exactly the sort of functions performed by the task forces at issue—gathering information, developing work plans, performing studies, drafting reports and even discussing preliminary findings with agency employees." *Ibid.* Based on this finding, Judge Gesell concluded that "[t]he Act does not cover groups performing staff functions such as those performed by the so-called task forces." *Ibid. See also Washington Post v. National Council on the Arts,* Civ.A. No. 92–0955 (D.D.C. April 29, 1992) (informal, information-gathering working groups not subject to FACA). *But see* Federal Advisory Committee Management Regulations, 41 C.F.R. § 101–6.1004(i) (subgroups subject to FACA when "an agency accepts the group's deliberations as a source of consensus advice or recommendations").

Similarly, the regulations under FACA exclude from the Act's coverage

> [m]eetings of two or more advisory committee or subcommittee members convened solely to gather information or conduct research for a chartered advisory committee, to analyze relevant issues

---

10. The working group been subdivided into fifteen task-specific cluster groups. Declaration of

Ira Magaziner ¶ 15.

and facts, or to draft proposed position papers for deliberation by the advisory committee or a subcommittee of the advisory committee.

41 C.F.R. § 101–6.1004(k). Plaintiffs have alleged no activities by the working group that fall outside of these activities.

Based on the case law and the appropriate regulations, therefore, the court finds that the interdepartmental working group (as well as the fifteen cluster groups into which it has been divided) directly compares to the task forces in *NAHC* and fully meets the exclusion of § 101–6.1004(k). The declaration of Ira Magaziner demonstrates that the various cluster groups are gathering information and formulating proposals *to be reported to the Task Force* so that the Task Force may present its legislative proposal to the President; the cluster groups are not providing the Task Force with "consensus advice." Moreover, Mr. Magaziner has represented that

[o]nly the Task Force will have authority to forward recommendations to the President, and only the Task Force will provide advice to the President. The interdepartmental working group is not charged with responsibility for making, and will not make, recommendations to

the President, and will not otherwise directly advise him.

Magaziner Declaration ¶ 5. In their complaint, plaintiffs have not charged otherwise. To adopt again the language of Judge Gesell,

[i]f the [working groups] were in fact providing advice directly to the [President], they might indeed be functioning as advisory committees with the meaning of the Act. However, ... plaintiffs have wholly failed to demonstrate by deposition or otherwise that such is the case.

*NAHC*, 557 F.Supp. at 529. Therefore, defendants' motion to dismiss any claims concerning the working group is granted as plaintiffs fail to state a claim upon which relief may be granted. *See* Fed.R.Civ.P. 12(b)(6).[11]

### 5. *Conclusion.*

Thus, although the court has a responsibility to construe FACA so as to avoid a constitutional question if possible, that construction is invalid if it completely subverts the explicit definitions of words provided by Congress. The court concedes that defendants present an attractive option: all the court must do is stretch the scope of the word "employee" just enough so as to include the First Lady within its purview.[12]

**11.** This is not a fact-intensive case. Therefore, if the court had not dismissed the working group claims on Rule 12(b)(6) grounds, it nonetheless would have granted defendants' motion for summary judgment as to those claims under Rule 56. Plaintiffs have alleged that the cluster groups are doing more than merely gathering information (although they have not, as the court noted above, alleged that the cluster groups are engaging in any activities that fall outside the parameters of 41 C.F.R. § 101–6.1004(k)). Plaintiffs' Memorandum at 23–25. Defendants deny plaintiffs' allegations, however, relying on the declaration of Ira Magaziner. In his declaration, Mr. Magaziner states that "[s]hortly after January 25, the interdepartmental working group began an intensive effort to gather information concerning the present health care system and alternatives for reform." Magaziner Declaration ¶ 10. Mr. Magaziner also averred that the "cluster groups and subgroups [further subdivisions of cluster groups] have been meeting regularly as part of an intensive effort to document the impact of existing health care policies and to gather information on possible alternatives." *Id.* at ¶ 19.

Plaintiffs have moved for expedited discovery in this case. However, in their memorandum filed March 4, 1993, which was misstyled but served as both a reply brief on their motion for a temporary restraining order as well as an opposition to defendants' motion to dismiss or for summary judgment, plaintiffs did not include a declaration that further discovery was necessary before summary judgment could be granted (as required by Fed.R.Civ.P. 56(f)). Under Fed.R.Civ.P. 56(e) and Local Rule 108, therefore, the court must accept the facts set forth in defendants' affidavit as the facts on which judgment shall be had. There thus are no genuine issues of material fact and summary judgment is appropriate on this issue.

**12.** The record suggests that Congressman William F. Clinger, Jr., the ranking Republican member of the House Committee on Government Operations, is "introducing legislation ... which will include the spouses of the President and Vice President under the definition of full-time federal officer for the purposes of FACA." Letter from Congressman William F. Clinger, Jr., to President William J. Clinton 2 (Feb. 1, 1993) (attached to affidavit of Genevieve M. Young).

If the court were to accept defendants' suggestion, it would be able to hold that FACA did not apply to the Task Force and thereby avoid the constitutional question. However, rewriting Congressional statutes sets a dangerous precedent, even when the justification is as popular as this one might be. The courts must stand firm and limit themselves to interpreting the law as it comes before them, not rewriting law as best they see fit. This principle is particularly compelling since in this democracy the judiciary is not elected to serve the popular mandate, but rather appointed to ensure that the constitution and the laws be justly interpreted and applied. While the court takes no pleasure in determining that one of the first actions taken by a new President is in direct violation of a statute enacted by Congress, the court's duty is to apply the laws to all individuals.

Thus, having determined that the First Lady is not an officer or employee of the Federal government, it follows that FACA applies to the Task Force. The court must now address the constitutional issue this case presents.

### B. *Separation of Powers.*

The issue the court must face is much more easily stated than resolved: does the application of FACA to the Task Force impinge upon the President's ability to perform his constitutionally mandated tasks? The Supreme Court has long recognized that the Constitution's division of governmental power into three branches endows each branch with a certain autonomy that must remain unchallenged by the other two branches. *See, e.g., Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (*"Nixon II"*); *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (*"Nixon I"*). However, there are times when the protection of constitutional interests requires that this division be breached; to this end, the Court has found that there are circumstances which permit one branch to encroach on the domain of another branch.

### 1. *Intruding upon the President's Powers.*

When a separation of powers issue arises, the court must first look to whether the statute prevents the President from accomplishing his constitutionally assigned functions. *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. at 484, 109 S.Ct. at 2581 (Kennedy, J., concurring in judgment); *Morrison v. Olson*, 487 U.S. 654, 695, 108 S.Ct. 2597, 2621, 101 L.Ed.2d 569 (1988); *Nixon I*, 418 U.S. at 711–12, 94 S.Ct. at 3109. The court concludes that FACA does.

Article II, section 3 of the Constitution states that the President "shall from time to time ... recommend to [Congress'] Consideration such Measures as he shall judge necessary and expedient."[13] In order to formulate these measures, defendants

In his letter to President Clinton, Rep. Clinger advised the President that the Task Force violated FACA and asked that the President "take immediate steps to ensure that no further violations of this Act occur." *Ibid.* Rep. Clinger suggested that President Clinton remedy this violation by ensuring that the Task Force comply with FACA or by "submit[ting] legislation to Congress seeking an exemption for this task force from the FACA provisions." *Ibid.* President Clinton's response, through his counsel Bernard W. Nussbaum, was that "[i]t is our opinion that the Federal Advisory Committee Act ("FACA") does not, and was not intended by Congress to, apply to the health care task force." Letter from Bernard W. Nussbaum to the Hon. William F. Clinger, Jr. 1 (Feb. 5, 1993) (attached to affidavit of Genevieve M. Young).

As a result of the court's rejection of this position, President Clinton has now precipitated a constitutional confrontation. Of course, passage of legislation (which presumably would be signed without hesitation by President Clinton) would obviate the need for cases such as this involving the First Lady. Passage of legislation is advantageous for another reason as well: action by Congress, rather than the judicial rewriting of an inconvenient statute which defendants seek, is the proper way for laws to be made in this democracy.

**13.** Plaintiffs have argued that the Constitution does not *obligate* the President to propose legislation but rather only permits it. Thus, they conclude, FACA does not impair the President's duties. The court disagrees. Even though the President need not propose legislation under the Constitution, it certainly is within his enumerated powers. Thus, if FACA impedes his ability to recommend measures to Congress, it necessarily impinges upon the exercise of his Constitutional duties.

claim, the President must be able to meet confidentially with his advisors. He must be able to trust that his advisors shall speak with complete candor and that they will not be cowed by the fear of premature public reaction. That candor is risked should FACA apply to the Task Force. A realistic and practical appraisal of the application of FACA to these presidential advisors reveals that FACA prevents the President from receiving the full measure of the Task Force's advice. When confidentiality is compromised and advisors are afraid to speak, the President is necessarily hampered in his ability to obtain the information he needs to offer proposed legislation to Congress. Thus, the court holds that the application of FACA presents "the potential for disruption" of the President's accomplishing his constitutionally assigned functions, *Nixon II*, 433 U.S. at 443, 97 S.Ct. at 2790, and that FACA intrudes on the President's powers. *See Morrison*, 487 U.S. at 695, 108 S.Ct. at 2621.

### 2. *Balancing the Interests.*

The next step in the inquiry, then, is to determine whether this Congressional intrusion "is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Ibid.* To conduct this inquiry, the court must distinguish between two types of Task Force meetings: those at which the Task Force is gathering or reporting information and facts; and those at which the Task Force is formulating its recommendations for the President.[14] The executive branch's interests in these two types of meetings are different; thus, when the court weighs them against Congress' interests, it reaches different results.

Before attempting to balance the interests of the respective branches, however, the court must examine the nature of the Presidential power defendants assert: if the Constitution explicitly grants the power

to the President, then Congressional regulation of that power cannot be tolerated. As Justice Kennedy recently noted, "where the Constitution by explicit text commits the power at issue to the exclusive control of the President, we have refused to tolerate *any* intrusion by the Legislative Branch." *Public Citizen*, 491 U.S. at 485, 109 S.Ct. at 2582 (Kennedy, J., concurring in the judgment). On issues such as this, the Constitution has struck the balance between Congress and the President, and this court may not permit the legislative branch to impose its restrictions on the President as he performs his constitutional obligations.

Of course, the President's power to propose whatever legislation he deems necessary is a power afforded solely to the President. However, the explicit power is a limited one: it only precludes Congress from barring the President's proposing of legislation. Thus, if Congress, for whatever reason, regulated the President's ability to propose legislation (for instance, by limiting the president to only ten pieces of proposed legislation each term), that regulation necessarily would be unconstitutional as a violation of separation of powers. However, where Congress does not directly limit an explicit power of the President, but rather indirectly affects a presidential power that is not specifically enumerated in the Constitution (here, the power to obtain the views of his advisors so that he might propose legislation), the statute is not unconstitutional *per se;* instead, the court must balance the interests of the two branches.

■ As to the information-gathering and information-reporting meetings of the Task Force, the presidential interest in confidentiality is not present. As the Task Force is not formulating or reporting advice and recommendations at those meetings, there is no concern that the Task Force's mem-

---

**14.** Distinguishing between fact-finding and deliberating is not novel. *See, e.g., Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921 (D.C.Cir.1982) (addressing pre-decisional processes under Government in the Sunshine Act), and *Washington Post v. National Council on the Arts*, Civ.A. No. 92–0955 (D.D.C. Apr. 29, 1992) (informal, information-gathering working groups not subject to FACA). A similar distinction has also been recognized in the deliberative process privilege in exemption five of the Freedom of Information Act, 5 U.S.C. § 552(b)(5). *See, e.g., EPA v. Mink*, 410 U.S. 73, 89–91, 93 S.Ct. 827, 837–38, 35 L.Ed.2d 119 (1973).

bers will not be candid or that they will shrink from performing their fact-finding for fear of the public's response. On the other hand, the congressional interest in openness and accountability clearly is present at these meetings. The public has the right to know what information is being presented to the Task Force and by whom it is being given; to learn of the costs involved in the gathering of the facts; and to attend these meetings. As the court finds that the President's interest is outweighed by Congress' interest, the court holds that the Task Force must comply with FACA and may not conduct any fact-finding or information-gathering meetings until it has complied with its regulations.[15]

■ However, with respect to the meetings at which the Task Force formulates its recommendations for the President, the balance weighs in favor of the President. With respect to these meetings, plaintiffs have demonstrated "no overriding congressional interest ... that outweighs FACA's intrusion on the ... power of the President." *Washington Legal Foundation,* 691 F.Supp. at 492 (addressing U.S. Const. Art. II, § 2). And, it is at these meetings that the President's need for candid advice is at its greatest. The President's interest in confidentiality is particularly present as the Task Force *directly* advises the President as to what legislation he should propose.

Plaintiffs primarily seek access to the Task Force's meetings, presumably so that they may influence the resulting legislative proposals. However, defendants have averred that plaintiffs will have opportunities to address the Task Force and air their views at some of the Task Force's meetings. And, the court's order will ensure that plaintiffs have access to all information-gathering and fact-finding meetings. In addition, any proposed legislation must be presented to Congress, and plaintiffs will have ample opportunity to lobby their representatives and senators. The Task Force's pronouncements are not the final word on the subject of health care reform. Thus, any congressional interest in opening these meetings is obviated by plaintiffs' opportunities to address the Task Force and Congress.

Plaintiffs also claim that the court should not hold FACA unconstitutional because the President's interest in confidentiality and candor are protected by the Government in the Sunshine Act, 5 U.S.C. § 552b, which is incorporated into FACA through § 10(d). However, §§ 552b(c)(1)—(10), which provide ten exceptions to the general proposition that all affected meetings must be open to the public, are narrowly drawn and highly specific; as a result, they hardly allow the President the freedom he needs to perform his constitutional duties.[16]

---

15. The government argues that FACA should be declared unconstitutional in its application to *all* meetings of the Task Force, including those at which the Task Force merely gathers or reports facts. However, this argument is too broad as it discounts the important balance the court must strike when it faces a constitutional issue of this nature: the balance between the interests of Congress and the interests of the President. To adopt the government's position *in toto* (by not striking a balance and holding that the President's interest by definition outweigh Congress's) not only would gut FACA but also would immeasurably augment the autonomy and power of the Executive Branch. Just as the court cannot allow Congress impermissibly to impinge upon the President's ability to perform his constitutional duties, it cannot allow the President to augment his power to the detriment of congressional interests.

16. Only one of the exemptions even arguably applies to the Task Force. Section (c)(9)(B) exempts from the Act (and thus from FACA) any

information "the disclosure of which would— (B) in the case of any agency, be likely to significantly frustrate implementation of a proposed agency action...." However, several courts have addressed this provision, and all have construed the standard so narrowly that no Task Force meeting could ever meet its terms. For instance, in *Common Cause v. Nuclear Regulatory Comm'n,* 674 F.2d 921 (D.C.Cir. 1982), the Court of Appeals held that § (c)(9)(B) did not exempt pre-decisional deliberations. In fact, the court looked to the regulations accompanying the statute and held that the § (c)(9)(B) provided only a very narrow exemption applicable to very specific circumstances. Similarly, in *Public Citizen v. National Economic Comm'n,* 703 F.Supp. 113 (D.D.C.1989), even though the court found that publicizing the Commission's hearings "would alter the outcome of the Commission's work," 703 F.Supp. at 116, the court nonetheless held that § (c)(9)(B) did not apply. Constrained as it is by *Common Cause,* this court can not now reinterpret § (c)(9)(B) and

Therefore, the court holds that the President's interest at these meetings outweighs the interest of Congress as expressed in FACA. The application of FACA to these meetings is unconstitutional as a violation of separation of powers principles.

### 3. *Conclusion.*

Thus, the court holds that the imposition of FACA on the President's Task Force on National Health Care Reform impermissibly imposes upon the President's enumerated power, as set forth in Art. II, § 3, to recommend to Congress such measures as he deems necessary and expedient, but only as to those meetings of the Task Force at which the Task Force formulates its recommendations or presents these recommendations to the President. The court therefore declares that the following three sub-sections of § 10 of FACA are unconstitutional as applied to these meetings:

● Sections 10(a)(1) and 10(a)(3) directly affect the President's ability to perform his constitutional duty. Because they open the advice and recommendation sessions of the advisory committee to the public, they would affect the candor with which the committee's members deliberate their findings and proposals. This prevents the President from receiving the advice he needs to recommend legislation to the Congress.

● Similarly, § 10(c), by subjecting the advice and recommendation meetings to subsequent public scrutiny, would have the same effect on the candor of the advisors. These meetings, too, must be kept confidential.

However, the rest of FACA does not impose impermissibly upon the President's ability to perform his duties. Section 9(c), for instance, which requires that a charter

be filed, will not affect the confidentiality of meetings. Section 10(a)(2)'s mandatory announcement of all meetings—including advice and recommendation meetings—also has no effect on the advisors' deliberations; that the public knows that the Task Force is meeting does not affect confidentiality *within* the meeting or impinge upon the President's power.

Section 10(b) is also constitutional since the deliberative process exemption of the Freedom of Information Act, 5 U.S.C. § 552, will allow the advisors the confidentiality they need to enable the President to perform his obligations. This section also addresses the product of the working group as all materials prepared *for* as well as by the Task Force shall be made available to the public. Thus, the public interest in ensuring that special interests do not overly affect Task Force or working group activities will be preserved.[17]

Further, Section 10(d) is not implicated since §§ 10(a)(1) and 10(a)(3) may not to be applied to the Task Force when it meets in advice and recommendation meetings. All other provisions of FACA likewise are enforceable against all proceedings of the Task Force.[18]

Since the application of FACA to all other operations of the Task Force does not violate the separation of powers principles, the court will enjoin all further meetings of the Task Force until such time as the Task Force is in full compliance with each of the requirements of FACA.

## IV. THE REMAINING THREE PRELIMINARY INJUNCTION CRITERIA.

### A. *Irreparable Injury.*

Plaintiffs argue that the court should follow previous FACA decisions,

---

greatly expand its scope. Thus, plaintiffs' reliance on the Government in the Sunshine Act is misplaced.

17. "This provision coupled with the requirement that complete and accurate minutes of committee meetings be kept serves to prevent the surreptitious use of advisory committees to further the interests of any special interest group." H.R.Rep. No. 92–1017, 92d Congress, 2d Sess. 10 (1972), U.S.Code Cong. & Admin.News 1972, pp. 3491, 3500.

18. The court expresses one caveat: The parties have alluded to FACA's balanced viewpoint requirements (§ 5(b)(2)), but plaintiffs have not raised the issue and the question has not been briefed by the parties. Although it is unlikely that such a requirement could survive the balancing test applied in Part 2., above, the issue is not properly before the court; therefore, the court will not decide whether such a requirement impermissibly interferes with the President's ability to perform his constitutional tasks.

particularly *Public Citizen v. National Economic Comm'n*, 703 F.Supp. 113 (D.D.C.1989), and grant plaintiffs a preliminary injunction. Defendants, for their part, claim that plaintiffs will suffer no immediate irreparable injury for three reasons:

● since the Task Force is not subject to FACA, the plaintiffs have no rights under FACA;

● since the parties will have opportunities to address *some* of the Task Force's meetings as well as the opportunity to address Congress (once the Task Force reports to the President and he in turn proposes legislation based upon the Task Force's advice); and

● since no meetings of the Task Force have been scheduled.

None of defendants' contentions, however, distinguish this case from *National Economic Comm'n.*

First, the court's holding in Part III., above, is that some of the meetings of the Task Force *are* subject to FACA; thus, the first objection is not helpful to defendants. Similarly unavailing is defendants' third argument as it is apparent that the Task Force will meet shortly.[19]

As to the second argument, defendants address only one-half of the problem. While it may be true that plaintiffs will have other opportunities to affect the course of the legislation, FACA's purpose is also to open—contemporaneously—to the light of public scrutiny the workings of advisory committees subject to FACA. This goal cannot be met if the court does not enter a restraining order, as the *National Economic Comm'n* court observed:

The right to view the advisory committee's discussion of policy matters in public and the right to confront, through observation, the decision-making process as it occurs, will be obviated.

703 F.Supp. at 129.[20]

The court therefore finds that plaintiffs have satisfied the irreparable injury standard.

B. *No Injury to Other Parties and the Public Interest.*

The third and fourth *Holiday Tours* criteria are taken together. Plaintiffs argue that the public interest, as set forth in FACA, will be undermined if the Task Force meets without first complying with FACA's strictures. Defendants' two arguments merely parallel their arguments on the merits of the issue: first, that the Task Force should not be subject to FACA; and second, that if the Task Force is subject to FACA, then FACA is unconstitutional. The court has already resolved these issues above and found that defendants' positions are unpersuasive (at least in part). In addition, the Task Force may comply with FACA's chartering requirements in quick fashion; this therefore serves more as an inconvenience than an injury. Finally, exposing the fact-gathering and fact-reporting meetings to public scrutiny similarly will not cause any significant injury to the Task Force (which, after all, had planned on opening some of its meetings to the public anyway). Balanced against these minor inconveniences is the great benefit to the public of opening the Task Force's meetings to the public.

Therefore, the court finds that the public interest will be served if the court grants plaintiffs' motion in part. Again, the *Na-*

---

**19.** This is merely a matter of logic. Created on January 25th and given only 100 days to report, the Task Force is now in its 45th day of existence. By the court's count, that leaves only 55 days to meet, gather evidence, formulate proposals, and report to the President. This limited period, although probably insufficient for a temporary restraining order, satisfies the criteria for a preliminary injunction.

**20.** The court recognizes that there may be merit in developing a health care plan of the sort the President apparently envisions largely outside the public's scrutiny; too much "sunshine" is not necessarily productive and may result in half-baked or overcooked plans. However, Congress has determined that public scrutiny is an important element of the decisional process, and the court does not have power to alter this judgment—correct or incorrect as it may be—unless it infringes impermissibly on the President's ability to perform his constitutional duties.

*tional Economic Comm'n* court is persuasive:

> Rather than harm, [applying FACA] will highlight vividly the essence of our democratic society, providing the public its right to know how its government is conducting the public's business.

*Ibid.* Plaintiffs have therefore met all the criteria for a preliminary injunction.

## V. CONCLUSION.

The court today is faced with two difficult tasks: declaring an act of Congress unconstitutional; and declaring that the actions of a new President violate the law. Nonetheless, the Constitution demands that all "judicial Officers ... shall be bound by Oath or Affirmation[ ] to support this Constitution," U.S. Const. Art. VI, and this responsibility includes ensuring that no branch of government appropriates the responsibilities of another branch. It is not a power to be taken lightly, but it is a power that must be taken.

For the reasons stated above, plaintiffs' motion for a temporary restraining order and a preliminary injunction is granted in part; defendants' motion to dismiss or, in the alternative, for summary judgment is also granted in part. An appropriate order accompanies this memorandum opinion.

### ORDER

The case comes before the court on plaintiffs' motion for a temporary restraining order and a preliminary injunction; defendants' motion to dismiss or, in the alternative, for summary judgment; and plaintiffs' memorandum in opposition to defendants' motion and in support of plaintiffs' motion. Also before the court is plaintiffs' motion for expedited discovery.

For the reasons stated in the accompanying memorandum opinion, and having held that the application of certain sections of FACA to certain meetings of the President's Task Force on National Health Care Reform is unconstitutional as a violation of separation of powers principles, it is hereby ORDERED that:

1. Plaintiffs' motion for a preliminary injunction is GRANTED in part. Defendants are hereby PRELIMINARILY ENJOINED from holding or conducting any meetings of the President's Task Force on National Health Care Reform and any subgroups or subcommittees thereof until such time as the Task Force is in full compliance with the requirements of FACA (except as provided in ¶ 2 of this order). In addition, all fact-finding and fact-reporting meetings of the Task Force must comply fully with the requirements of FACA.

2. Defendants' motion to dismiss or, in the alternative, for summary judgment is GRANTED in part. All claims based on the interdepartmental working group are DISMISSED, pursuant to Fed.R.Civ.P. 12(b)(6), for failing to state a claim upon which relief may be granted. In addition, plaintiffs' claims based on meetings of the Task Force which are held for the purpose of formulating advice and recommendations for the President are also DISMISSED under Rule 12(b)(6). Sections §§ 10(a)(1), 10(a)(3), and 10(c) of FACA are not applicable to these meetings since their application to these meetings is unconstitutional as a violation of separation of powers principles.

3. Plaintiffs' motion for expedited discovery is DENIED.

4. Plaintiffs shall post with the Clerk of the Court a bond totalling $100.00 in cash or surety.

SO ORDERED.