NATIONAL ANTI–HUNGER COALI-
TION, et al., Appellants,

v.

EXECUTIVE COMMITTEE OF the
PRESIDENT'S PRIVATE SECTOR
SURVEY ON COST CONTROL, et al.

No. 83–1248.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 5, 1983.

Decided June 14, 1983.

Eric R. Glitzenstein, Washington, D.C.,
with whom Alan B. Morrison, David C. Vla-
deck and Jack Stolier, Washington, D.C.,
were on the brief, for appellants.

Richard K. Willard, Deputy Asst. Atty.
Gen., Washington, D.C., with whom J. Paul
McGrath, Asst. Atty. Gen., Stanley S. Har-
ris, U.S. Atty., and John F. Cordes, Atty.,

Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WILKEY and EDWARDS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This is an appeal from the dismissal of a complaint, grounded in the Federal Advisory Committee Act ("FACA" or "Act"), 5 U.S.C. app. I §§ 1–15 (1976 & Supp. V 1981), challenging the composition and procedures of the Executive Committee of the President's Private Sector Survey on Cost Control ("Survey") and three task forces established to assist the Survey in the study of domestic feeding programs for low-income persons. The appellants, the National Anti-Hunger Coalition and two low-income individuals ("Coalition"), argue that the Survey violates several requirements of the FACA. They claim, first, that the composition of the Executive Committee, consisting almost exclusively of executives of large corporations and containing no representatives of the feeding programs under consideration, cannot be squared with the "balanced membership" requirement of the Act. And they contend, second, that the Survey's task forces are themselves advisory committees whose structure and procedures contravene various provisions of the Act.

We approve the reasoning under which the District Court rejected the appellants' contentions, and we affirm its decision on the basis of the record on appeal. We note, however, that certain fundamental assumptions underlying the trial court's decision allegedly have been called into question by new evidence concerning the scope of the Survey's inquiry and the manner in which its recommendations are formulated. We therefore emphasize that nothing in this decision is intended to foreclose the possibility of further judicial consideration in light of facts not presently before the court on this record.

I

The facts underlying the District Court's decision are adequately recounted in its opinion, *National Anti-Hunger Coalition v. Executive Committee of the President's Private Sector Survey on Cost Control,* 557 F.Supp. 524 (D.D.C.1983), and need only be summarized briefly here. The government-wide Survey challenged in this appeal is designed to proceed in four stages. The bulk of the Survey's work to date has fallen to the thirty-six task forces organized by the nonprofit Foundation for the President's Private Sector Survey on Cost Control ("Foundation") and chaired by members of the Executive Committee. These task forces gather information, perform studies, and draft reports and recommendations. Their recommendations and reports are transmitted to the Foundation's Management Office, which reviews them, orders revisions, and submits them to the Executive Committee of the Survey, a body that was organized pursuant to the FACA. When these documents reach the Executive Committee, they are first reviewed by a thirty-member subcommittee that also is subject to the requirements of the FACA. This subcommittee is responsible for reviewing the task force reports and making detailed recommendations to the President and the affected federal agencies. Eventually, the entire Executive Committee will be convened to formulate a summary report for the President.

The final two stages of the Survey's inquiry, the Government concedes, are subject to the requirements of the FACA, but the applicability of the Act to the earlier stages is hotly disputed. Congress enacted the FACA in 1972 "to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals." *Food Chemical News, Inc. v. Davis,* 378 F.Supp. 1048, 1051 (D.D.C.1974). By its terms, the Act applies—with several exceptions not relevant here—to "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof"

that is "established by statute or reorganization plan, or . . . established or utilized by the President, or . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies. . . ." 5 U.S.C. app. I § 3(2) (1976). All advisory committees meeting this definition are subject to open meeting requirements, and most records, reports, and other documents generated by the committees must be open to public inspection. *Id.* § 10. Each advisory committee's membership, moreover, must be "fairly balanced in terms of the points of view represented and the functions to be performed." *Id.* § 5(b)(2). Although this latter requirement is set forth in a subsection explicitly governing only those advisory committees established by statute, the Act makes it plain that, "[t]o the extent they are applicable, the guidelines set out in subsection (b) of this section shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee." *Id.* § 5(c).[1]

## II

The District Court began its analysis of the Survey's consistency with the governing principles established by the FACA with the threshold question of standing. Relying heavily on dicta in our recent decision in *Physicians' Education Network, Inc. v. HEW,* 653 F.2d 621 (D.C.Cir.1981) (per curiam), the court held that the Coalition had "standing to challenge committee membership as well as to question the committee's compliance with the procedural requirements of the Act." 557 F.Supp. at 527 (footnote omitted). The standing question is a close one that we need not resolve to

---

1. Accordingly, we reject the Government's contention that the "fairly balanced" requirement of § 5(b)(2) is not binding on the President. Although we have previously suggested in dicta that the requirement may not be applicable to advisory committees that are not created by legislation, *Physicians' Educ. Network, Inc. v. HEW,* 653 F.2d 621, 622 (D.C.Cir.1981) (per curiam), closer attention to the statutory language leads us to conclude that the membership of advisory committees, whether established by legislation or by action of the President or an agency, must be "fairly balanced." *See National Nutritional Foods Ass'n v. Califano,* 603 F.2d 327, 334, 336 (2d Cir.1979) (§ 5(b)(2) is "made applicable" to agencies by § 5(c); "[i]f an agency wishes to rely publicly on the backing of an advisory committee, it must do what the statute commands"); *Metcalf v. National Petroleum Council,* 553 F.2d 176, 179 n. 35 (D.C.Cir.1977) ("fairly balanced" requirement is "made applicable" by § 5(c) to advisory committee established by Interior Department at President's request).

The Government finds support for its position in the use of the word "guidelines" and the phrase "to the extent they are applicable" in § 5(c). This reliance is misplaced. The term "guidelines" is used in the Act's legislative history to describe subsection (b), *see* H.R.Rep. No. 1017, 92d Cong., 2d Sess. 6 (1972), U.S. Code Cong. & Admin.News 1972, 3491, yet the "guidelines" are clearly mandated in the case of congressionally created advisory committees. And § 5(c) provides that these precepts "shall be followed" by the President and agency officials. These factors compel us to reject the contention that § 5(c) should be read as if it stated that "the requirements of § 5(b) shall serve as guidelines for the President." Congress' use of the phrase "to the extent they are applicable" also is easily explained: in some cases (*i.e.,* the appropriations provision in § 5(b)(4)), a requirement of § 5(b) is clearly inapplicable to advisory committees created by the President or an agency. But the balanced membership requirement of § 5(b)(2) has clear relevance to all types of advisory committees, and, under the terms of § 5(c), must be followed by the President.

This conclusion, we believe, constitutes no affront to the constitutional authority of the President. The FACA, of course, was not "intended to intrude upon the day-to-day functioning of the presidency or in any way to impede casual, informal contacts by the President or his immediate staff with interested segments of the population or restrict his ability to receive unsolicited views on topics useful to him in carrying out his overall executive and political responsibilities." *Nader v. Baroody,* 396 F.Supp. 1231, 1234 (D.D.C.1975). That kind of intrusion, the *Nader* court properly recognized, "would raise the most serious questions under our tripartite form of government as to the congressional power to restrict the effective discharge of the President's business." *Id.* (footnote omitted). But, where the President formally convenes an advisory committee pursuant to the FACA, he cannot claim that enforcement of the Act's requirements would unconstitutionally impede his ability to perform his functions.

decide this appeal, but we are inclined to agree with the District Court's conclusion.[2]

■ The District Court then turned to the merits of the Coalition's "balance" claim. Although it recognized that virtually every member of the Executive Committee was an executive of a major corporation and that no public interest representatives or beneficiaries of federal feeding programs had been appointed, the court rejected the challenge to the Committee's composition because "the function to be performed by the Private Sector Survey is narrow and explicit." 557 F.Supp. at 528. Since the Survey was designed to apply private sector expertise to attain cost-effective management in the federal government, the District Court held, the President legitimately could "select[] those who have experience in the fiscal management of large private organizations." *Id.* As a result, the court concluded, the alleged imbalances in membership are "simply irrelevant to the ability of the Executive Committee to perform its limited function fairly and impartially." *Id.*

On the basis of the record before it, the District Court's conclusion that the Executive Committee's members represent a fair balance of viewpoints given the functions to be performed is unimpeachable. Although the Coalition argued that the Committee had broadly interpreted its mandate and was considering substantive changes in federal policies and programs, it failed adequately to document this assertion. 557 F.Supp. at 528 n. 5. If it had, the Government conceded in the oral argument before this court, the approach to the "balance" issue adopted by the District Court may well have dictated a different result.

Since the time when the District Court rendered its decision, a considerable amount of new evidence, allegedly bearing on the scope of the Survey's inquiry, has become available. According to the appellants, this evidence, which consists primarily of the reports of several task forces, conclusively demonstrates that the advisory bodies are studying and recommending major programmatic cutbacks in federal feeding programs. As a result, the appellants claim, the District Court's reasoning now supports their contention that the Executive Committee's membership is unbalanced. The Government argues, on the other hand, that, while the line between "policy" and "management" is not always a bright one,

**2.** In *Physicians' Education Network,* we found that the plaintiff lacked standing to challenge the "balance" of an advisory committee because there was no likelihood that the relief requested would redress the complained-of economic injury. But, in the course of doing so, we observed that the plaintiff did "not allege that it sought and was denied participation in the panel's meetings, or that it sought and was denied representation on the panel itself. Allegations of this kind have been found sufficient in other cases to support standing to invoke the provisions of the [FACA] against an agency." 653 F.2d at 623 (footnote omitted).

As the Government points out, the cases on which we relied in *Physicians' Education Network* involved attempts to enforce rights conferred by § 10 of the Act; unlike § 10, the Government argues, § 5 confers no specific right on anyone, and a violation of the latter provision does not give rise to an injury-in-fact. In the Government's view, the appellants' claim of injury can rest only on the possibility of an ultimate diminution of federal food benefits, and "the asserted harm is speculative and conjectural *in the purest sense." Metcalf v. National Petroleum Council,* 553 F.2d 176, 186 (D.C.Cir.1977) (emphasis in original) (footnote omitted). Although we express no view on whether this type of injury might confer standing if the Survey clearly had gone beyond its allegedly limited role and was recommending substantive cutbacks in federal feeding programs, we agree with the Government that, on the basis of the evidence before the District Court, this asserted injury would not confer standing.

Like the District Court, however, we can find "no distinction between requirements under § 5 and requirements under § 10 of the Act" for purposes of standing. 557 F.Supp. at 527. Section 5, to be sure, confers no cognizable personal right to an advisory committee appointment. But, the legislative history makes clear, the "fairly balanced" requirement was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee. *See* S. Rep. No. 1098, 92d Cong., 2d Sess. 9 (1972); H.R. Rep. No. 1017, *supra* note 2, at 6. When the requirement is ignored, therefore, persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue.

the task forces' recommendations are oriented more to management than to policy. We recognize that the task force reports, whether characterized as "newly discovered evidence" or "changed circumstances," may bear heavily on the fundamental premise underlying the District Court's decision, but we cannot conclude that they warrant reversing or vacating its judgment.

As we have previously recognized, "[a]ppellate review is ordinarily unaffected by matters not contained in the record." *Goland v. CIA,* 607 F.2d 339, 367, 370 (D.C. Cir.1979) (per curiam on motion to vacate and petition for rehearing) (footnote omitted), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). While altered circumstances or new evidence are sometimes "properly noticed on appeal," *id.* at 371, an appellate court ordinarily

> has no factfinding function. It cannot receive new evidence from the parties, determine where the truth actually lies, and base its decision on that determination. Factfinding and the creation of a record are the functions of the district court; therefore, the consideration of newly-discovered evidence is a matter for the district court. The proper procedure for dealing with newly discovered evidence is for the party to move for relief from the judgment in the district court under rule 60(b) of the Federal Rules of Civil Procedure.

*Id.; see Weisberg v. U.S. Department of Justice,* 705 F.2d 1344, 1361–1362 (D.C.Cir. 1983).[3] Because the evidence on which the appellants rely is not in the record on appeal and was not presented to the District Court on a motion for reconsideration or relief from the judgment, we affirm the court's decision that the Executive Committee was adequately balanced in view of its limited function.[4]

■ This rationale also justifies an affirmance of the District Court's holding with respect to the task forces. On the basis of the record before it, the court's characterization of the task forces as the Executive Committee's "staff" and its conclusion that the task forces are "not provid[ing] advice directly to the President or any agency," 557 F.Supp. at 529, were perfectly defensible. At that time, it appeared that the task force reports and recommendations would be exhaustively reviewed and revised by the Executive Committee—the entity nominally responsible for advising the President and federal agencies. But, the appellants argue, the District Court's conclusions have been called into question by new evidence suggesting both that task force reports are transmitted directly to federal decision makers before they are made publicly available and that the subcommittee of the Executive Committee is merely "rubber stamping" the task forces'

---

**3.** It has sometimes been suggested that, "[t]o be 'newly discovered' [within the meaning of FED.R.CIV.P. 60(b)(2) ], evidence must have been in existence at the time of the trial." *Goland v. CIA,* 607 F.2d at 371 n.12 (per curiam on motion to vacate and petition for rehearing). We believe, however, that evidence falls within the rule as long as it "pertain[s] to facts in existence at the time of the trial, and not to facts that have occurred subsequently." 6A J. MOORE, FEDERAL PRACTICE § 59.08[3] (1982) (footnote omitted); *see* 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2808 (1973). *But see id.* at § 2859. Although the task force reports did not come into existence until after the District Court's decision, they pertain to facts in existence at the time of that decision since it seems highly unlikely that the scope of the Survey's inquiry changed radically in the short time between the release of the decision and the release of the first task force reports. If this speculation proves incorrect, we believe

that the resulting altered circumstances could support a motion for relief from the judgment under FED.R.CIV.P. 60(b)(6).

**4.** The availability of the rule 60(b) procedure allows us to avoid considering whether this court, in the exercise of its appellate jurisdiction under 28 U.S.C. § 2106 (1976), should remand the case for further proceedings in light of the new facts. Assuming, for the moment, that we possess "ample revisory power under section 2106 *in appropriate cases,*" *Goland v. CIA,* 607 F.2d at 372 (per curiam on motion to vacate and petition for rehearing) (emphasis in original), we conclude that such extraordinary relief is not called for in this case. *See also Carr v. District of Columbia,* 543 F.2d 917, 929 & n. 96 (D.C.Cir.1976) (leaving open the question whether § 2106 affords an alternative procedure for reopening a final judgment in light of new facts).

recommendations with little or no independent consideration. Either of these facts, if true, might well have led the District Court to conclude that the task forces themselves were subject to the requirements of the FACA. Nevertheless, we are in no position to weigh this new evidence in order to "determine where the truth actually lies," *Goland v. CIA,* 607 F.2d at 371 (per curiam on motion to vacate and petition for rehearing), and we believe that, under the circumstances of this case, we should do no more than recommend that the appellants seek appropriate relief from the District Court.[5]

### III

For the reasons set forth above, the judgment of the District Court is

*Affirmed.*

---

**5.** The Supreme Court has held that the filing of an appeal does not affect the right to seek or obtain relief from a judgment under rule 60(b). *Standard Oil Co. v. United States,* 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976) (per curiam). On the basis of the decision in *Standard Oil,* it is clear that a timely request under rule 60(b), based upon "newly discovered evidence," may be granted even after an appeal has been decided. As the Court noted, "[l]ike the original district court judgment, the appellate mandate relates to the record and issues then before the court, and does not purport to deal with possible later events. Hence, the district judge is not flouting the mandate by acting on the motion." *Id.* at 18, 97 S.Ct. at 31.