**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0680n.06
Filed: September 19, 2007

**05-2479/06-2538**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH and ILLINOIS NATIONAL INSURANCE COMPANY, | ) ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| ALTICOR, INC., AMWAY CORPORATION, QUIXTAR, INC., | ) ) ) ) | |
| Defendants-Appellants. | | |

Before:  BATCHELDER and DAUGHTREY, Circuit Judges, and ROSEN,[*] District Judge.

**PER CURIAM.**  The defendants, Alticor, Inc., Amway Corporation, and Quixtar, Inc. (collectively, Alticor), appeal from two rulings by the district court in a declaratory judgment action filed by National Union Fire Insurance Company of Pittsburgh and Illinois National Insurance Company (collectively, the insurers).  Alticor first contends that the district court erroneously determined that the insurers were not required, under insurance policies

---

[*]The Hon. Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

issued to Alticor, to defend Alticor in a legal action filed in the United States District Court for the Western District of Missouri by a third party. In a separate appeal, Alticor also challenges the district court's decision denying relief pursuant to the provisions of Federal Rule of Civil Procedure 60(b)(2). For the reasons set out below, we find no error in connection with the judgments in these consolidated appeals and, therefore, affirm the district court's judgments in both cases.

## FACTUAL AND PROCEDURAL BACKGROUND

**Underlying Civil Action (Western District of Missouri)**

In August 2003, Nitro Distributing, Inc., West Palm Convention Services, Inc., Netco, Inc., Schmitz & Associates, Inc., and U-Can-II, Inc., (collectively, the *Nitro* plaintiffs) filed suit in federal district court in the western district of Missouri, alleging that Alticor, Amway, and Quixtar had engaged in "efforts to unlawfully influence, control, monopolize and manipulate a business enterprise operating in Missouri and engaged in interstate commerce." Specifically, the complaint contained the following counts: Count I (Antitrust Violation – Group Boycott); Count II (Antitrust Violation – Allocation of Customers); Count III (Antitrust Violation – Illegal Tying Arrangement); Count IV (Antitrust Violation – Conspiracy to Monopolize); Count V (Tortious Interference); and Count VI (Civil Conspiracy). The complaint further alleged that Alticor, Amway, and Quixtar "are so closely related and intertwined that they each constitute the alter ego of the other two." Indeed, the *Nitro* plaintiffs contended that, due to negative publicity that Amway received in the 1990's, "Amway moved all of its distributors to Quixtar effective January 1, 2003," and that

"the business operated by Quixtar today is essentially the Amway business." Moreover, the *Nitro* plaintiffs alleged that "Alticor is and/or was the parent company of Amway and Quixtar" and "is also a successor in interest of Amway."

**The Amway Operation**

According to the defendants, Amway was created as "a multilevel marketing company that manufactures a variety of home care, health and beauty products, and sells them through millions of independent distributors in more than 80 countries." These "distributors sell Amway products, and in turn sponsor others to sell Amway products," receiving as payment a percentage of the income generated by downline distributors. In addition, the *Nitro* plaintiffs alleged that "Amway *requires* its Amway distributors to train and motivate the downline distributors that they sponsor and bring into Amway's multi-level business. This requirement gave rise to what is commonly known today as the Amway 'tool and function business.'" As further described in the *Nitro* complaint:

> In conjunction with this separate business, "tools" refer to instructional and motivational materials such as audio and video tapes, books, electronic literature, etc., also sometimes referred to as "business support materials" or "BSMs." "Functions" refer to instructional seminars, motivational rallies and conventions, some in the past attracting over 40,000 attendees. The sale of the tools and charging Amway distributors a fee to attend major functions generates profits for those participating distributors in the tool and function business.

Each of the *Nitro* plaintiffs was engaged in either the "tool" business or the "function" business, or both. Eventually, however, "Amway recognized the inherent problems of the tool and function business as operated by . . . large pyramid distributor systems," especially

-3-

the fact that those businesses took substantial money away from Amway, which was itself a competitor within the tool and function business. Consequently, according to the *Nitro* plaintiffs, Amway began to conspire "to control, monopolize and manipulate the tool and function business" so as to restrain trade, all to the alleged detriment of the *Nitro* plaintiffs and others. It was this alleged conspiracy to restrain trade that led to the filing of the *Nitro* plaintiffs' 165-paragraph complaint against Alticor in August 2003.

**Request for Defense**

Alticor was insured under a comprehensive general liability policy initially underwritten by National Union Fire Insurance Company of Pittsburgh and, later, under a virtually identical policy issued by Illinois National Insurance Company. Pursuant to the relevant provisions of the policies, the insurers agreed both to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' . . . to which this insurance applies," and "to defend the insured against any 'suit' seeking those damages." Additionally, the policies specifically defined the "personal injury" that would trigger the duties to defend and/or to indemnify as:

> [I]njury, other than "bodily injury", arising out of one or more of the following offenses:
>
> a. False arrest, detention or imprisonment;
>
> b. Malicious prosecution;
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. *Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;* or

e. Oral or written publication of material that violates a person's right of privacy.

(Emphasis added.)

Upon being served with the *Nitro* plaintiffs' lawsuit, Alticor informed the insurer of the claims made against Alticor, explaining that "[t]he complaint alleges six counts of liability having to do with various alleged antitrust violations. We believe that paragraph 135(c) [of the complaint] and possibly others would be sufficient to extend coverage for the defense of this suit." Paragraph 135 of the complaint, contained under the heading for Count I (Antitrust Violation – Group Boycott), alleged, in its entirety:

Defendants' group boycott of Plaintiffs was designed to disadvantage the Plaintiffs as competitors of the conspirators in the distribution and sale of tools and functions, and/or as buyers from the conspirators, and was not the result of an independent business judgment. These tactics included, but were not necessarily limited to, the following:

(a) "blackballing" the principals of Plaintiffs from speaking at functions;

(b) refusing to edit and/or sell and/or advertise any tapes featuring the principals of the Plaintiffs;

(c) *isolating the Plaintiffs from their downline distributors by undermining and/or disparaging the Plaintiffs and/or their principals*; and

(d) persuading or coercing customers of the Plaintiffs to refuse to deal with or purchase tools and functions from them, which tools and functions were essential to maintain a viable network of distribution.

The conspirators used these same tactics against other tool and function distributors, the effect of which was to harm competition in the tool and function business.

(Emphasis added.)

Approximately three months later, National Union declined to defend and to indemnify Alticor in the *Nitro* action. According to a representative of the insurer:

> The insuring agreement in Coverage B of the National Union policies requires as a precondition to insurance coverage that an underlying complaint seek damages "because of" "personal injury" or "advertising injury" to which the insurance applies. The Underlying Complaint does not seek damages because of "personal injury" or "advertising injury" as those terms are defined in the National Union policies. Accordingly, insurance coverage for the Underlying Action is not provided under those policies for the Amway defendants.
>
> More specifically, the Underlying Complaint, in both form and substance, alleges claims of antitrust violations and tortious interference. (Counts I-V). Count VI, entitled "Civil Conspiracy," merely alleges that defendants conspired with others to commit the antitrust violations and tortious activity alleged in the prior counts. These allegations in the Underlying Complaint clearly do not allege activity that falls within sections a, b, c, or e of the definitions of "Personal Injury" and "Advertising Injury."
>
> The only definition that is even potentially relevant to this inquiry, based on [Alticor's] reference to paragraph 135(c), is section d, "Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or service." Paragraph 135(c), however, is also wholly insufficient to trigger insurance coverage (either defense or indemnity) under the National Union policies.
>
> The Underlying Complaint does not allege or purport to allege a cause of action for defamation or slander. Nor does it allege or purport to allege a cause of action for disparagement of goods, product, or services. Further, it does not appear that the plaintiffs in the Underlying Action are seeking damages "because of" personal injury or advertising injury. On the contrary, the damages sought by plaintiffs, even within the count that includes ¶ 135, are for antitrust violations and for harm caused by isolating the plaintiffs from their down-line distributors.

When Alticor expressed disagreement with the decision by National Union not to provide a defense or indemnification in the face of the *Nitro* complaint, National Union and Illinois National filed this declaratory judgment action in district court. In the complaint, the insurers sought "a determination of the rights and duties of the parties, and a declaration that no coverage exists under the . . . policies for the claims made in the Underlying Action." Eventually, the insurers filed a motion for summary judgment and Alticor filed its own motion for partial summary judgment. In response, the district judge issued a written opinion, ruling that the various policies' duty to defend was not implicated in this matter. According to the district court:

> While the Complaint does mention "disparagement" and "misrepresent[ation]," it does so only in the context of the anti-trust claims, *i.e.,*as legal jargon pertinent to anti-trust and not as a means of even arguably alleging a separate claim for libel, slander or product disparagement. There are no factual allegations from which one could conclude that the *Nitro* suit contemplated a claim for slander, libel or product disparagement. No slanderous or libelous statement is detailed, nor is a single instance of product disparagement described in the complaint.

Consequently, the court granted summary judgment to the plaintiff-insurers and denied Alticor's motion for partial summary judgment.

In October 2005, Alticor filed a timely notice of appeal that was docketed in this court as case number 05-2479. Eleven months later, in September 2006, the *Nitro* plaintiffs filed an amended complaint in the Missouri antitrust action against Alticor. That 253-paragraph complaint included most of the allegations in the original 2003 complaint but also added a count alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and another count specifically alleging "injurious falsehood," a

claim ostensibly – and neatly – falling within the insurance policies' duty-to-defend provisions.

In light of the filing of that amended complaint, Alticor moved the district court in Michigan for relief from judgment pursuant to Federal Rules of Civil Procedure 60(b)(2) and 60(b)(6).[1] In that motion, Alticor argued that "the First Amended Complaint in the *Nitro* Action constitutes newly discovered evidence and complete justification for relief from this Court's Opinion and Judgment dated September 12, 2005." Even though the appeal in No. 05-2479 was then pending, the district judge exercised his discretion to decide the Rule 60(b) motion. In doing so, he emphasized the "well-conceived rule that newly discovered evidence under Rule 59 or Rule 60(b)(2) must pertain to evidence which existed *at the time of trial.*" *Davis by Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 136 (6th Cir. 1990) (emphasis added). Because the "newly discovered evidence" – the first amended complaint in the *Nitro* action – did not exist at the time of the initial ruling on the insurance companies' duty to defend, the district court denied the motion for relief from judgment.

Alticor appealed that ruling to this court as well. Subsequently, by order of the court, the appeal from the denial of the Rule 60(b) motion (No. 06-2538) was consolidated for resolution with the appeal from the grant of summary judgment to the plaintiff-insurers (No. 05-2479).

## DISCUSSION

---

[1]The defendants do not argue the Rule 60(b)(6) aspect of their motion on appeal; therefore, that claim for relief has been abandoned. *See, e.g.*, *Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003).

**Duty to Defend and Indemnify (No. 05-2479)**

We review *de novo* the grant of summary judgment by a district court. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *See Ciminillo*, 434 F.3d at 464.

` Because federal jurisdiction over this case is premised upon the diversity of citizenship of the parties, we must apply state insurance law – here, Michigan insurance law, the law of the place of business of the defendant-insureds – as determined by that state's highest court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Pursuant to that law, an insurance company has a contractual obligation to defend and to indemnify its insured "with respect to insurance afforded by the policy. If the policy does not apply, there is no duty to defend." *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 481 (Mich. 1996). The duty to defend, however, is broader than the duty to indemnify. *See Auto Owners Ins. Co. v. City of Clare*, 521 N.W.2d 480, 487 (Mich. 1994). "It arises in instances in which coverage is even arguable, though the claim may be groundless or

frivolous." *Id.* Moreover, "[t]he duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible." *Am. Bumper*, 550 N.W.2d at 481. "If there is doubt regarding whether the insurer has the duty to defend, the doubt must be resolved in favor of the policy holder." *North Bank v. Cincinnati Ins. Cos.*, 125 F.3d 983, 986 (6th Cir. 1997).

Alticor contends that some of the *Nitro* allegations are at least arguably covered by the terms of the plaintiffs' insurance policies. Each of the relevant policies requires the insurers to defend and indemnify the defendants against suits by third parties for the "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Furthermore, Alticor contends, the *Nitro* complaint explicitly alleged that the defendants "undermin[ed] and/or disparag[ed] the [*Nitro*] Plaintiffs and/or their principals," ¶ 135(c); that they "misrepresent[ed] the opportunities, operation and dealings within the tool and function business," ¶ 162; and that they engaged in unlawful activities, including "misrepresentations," ¶ 163.

As highlighted by Alticor, the *Nitro* complaint did indeed use select words evoking references to the language of the policies' definitions of "personal injury." Nevertheless, mere recitation of terms such as "disparagement" or "misrepresentation" is not sufficient to bring a claim within the reaches of the comprehensive general liability policies. The policies at issue in this litigation clearly state that coverage is provided only for "sums that the insured becomes legally obligated to pay as damages because of 'personal injury.'" None

of the damages sought by the *Nitro* plaintiffs in their original complaint, however, are payments requested *because of* "personal injury."  Rather, as recognized by the district judge, all damages sought by the *Nitro* plaintiffs in the Missouri action were for various *antitrust injuries*, not for slander, libel, or product disparagement.

Indeed, the very allegation in the original complaint that Alticor cited to the insurers as evidence of the presence of a duty to defend – paragraph 135(c) – is included in the description of the *Nitro* plaintiffs' first cause of action for *"Antitrust Violation – Group Boycott."*  In addition, any other complaint assertions mentioning misrepresentation, interference, or disparagement highlighted by Alticor in its appellate brief also do not seek damages "because of" such misrepresentation, interference, or disparagement.  Again, the misrepresentations, interferences, and disparagements are alleged only in an effort to establish how Alticor allegedly harmed competition and, consequently, why the *Nitro* plaintiffs are entitled to damages "because of" that antitrust injury.  Because the policies at issue in this matter do not purport to cover antitrust injuries, and because the damages sought by the *Nitro* plaintiffs were only for such antitrust injuries, the policies issued by the plaintiff-insurers do not apply in this instance, and there was no duty to defend.  Consequently, the district court did not err in granting summary judgment to the plaintiff-insurers on the duty-to-defend aspect of the litigation and in denying partial summary judgment to Alticor on that same issue.

Alticor next contends that, even if the district court properly determined that the insurers had no duty *to defend* the lawsuit brought by the *Nitro* plaintiffs, the district judge

should not have also granted summary judgment to the insurers on their assertion that they also had no duty *to indemnify* the defendants for any recovery received by the *Nitro* plaintiffs. According to Alticor, "the duty to indemnify can only be determined on the actual facts determined at trial." Hence, they argue, an adequate period for discovery is essential before any decision on indemnification can be made.

Under established principles of Michigan insurance law, however, an insurer's duty *to defend* a lawsuit is broader than the duty *to indemnify*, *see Auto Owners*, 521 N.W.2d at 487, and is excused only in situations where "the policy does not apply." *Am. Bumper*, 550 N.W.2d at 481. Thus, if an insurance policy does not apply to allegations contained in a complaint because the pleading fails to raise even an arguable claim under the policy, such that an insurer has no duty to defend the lawsuit, that policy also cannot impose upon the insurer the more limited duty of indemnification. The district court thus also properly granted summary judgment to the plaintiff-insurers on their request for a declaration of their right not to indemnify Alticor in the *Nitro* action.

**Rule 60(b) Motion (No. 06-2538)**

As indicated above, almost a year after the district court granted summary judgment to National Union and Illinois National in this declaratory judgment proceeding, the *Nitro* plaintiffs filed an amended complaint in their federal court action in Missouri. In that filing, the third-party plaintiffs added a count that explicitly alleged "injurious falsehood" by Alticor that resulted in damage to the *Nitro* plaintiffs, a count that arguably could have triggered the

plaintiff-insurers' duty to defend Alticor under the terms of the relevant insurance policies.[2] Even though Alticor had already perfected an appeal from the district court's ruling that the plaintiff-insurers had no duty to defend or indemnify Alticor, the filing of the *Nitro* plaintiffs' amended complaint spurred Alticor to file with the district court a motion pursuant to Rule 60(b)(2) of the Federal Rules of Civil Procedure for relief from the judgment because of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)."

Ordinarily, the timely filing of an appeal divests the district court of jurisdiction "to reconsider its judgment until the case is remanded by the Court of Appeals." *Pittock v. Otis Elevator Co.*, 8 F.3d 325, 327 (6th Cir. 1993). In practice, however, this prohibition on reconsideration of a district court's judgment during a pending appeal affects only those situations in which the district judge expresses an inclination to grant the Rule 60(b) motion presented. Even in such cases, we have endorsed a specific procedure that allows for a decision on the post-judgment motion by the district judge during the pendency of an appeal to this court. *See Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002) (proper procedure requires movant to file motion in district court and, if district judge indicates that motion would be granted, to then file motion for remand in appellate court); *see also First Nat'l Bank of Salem, Ohio v. Hirsch*, 535 F.2d 343, 346 (6th Cir. 1976) (same). On the other hand, when the district court intends to deny a Rule 60(b) motion during the pendency of an appeal, no special procedures need be utilized by the movant or by the district judge.

---

[2]At oral argument, counsel for the insurers informed the court that they have provided Alticor with a defense under the amended Missouri complaint, from the date on which the amended complaint was filed forward. At dispute here, then, is the duty to defend Alticor prior to that date.

-13-

*See Flynt v. Brownfield, Bowen & Bally*, 726 F. Supp. 1106, 1108-09 (S.D. Ohio 1989); 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2873 (2d ed. 1995). Because the district court denied Alticor's Rule 60(b) motion in this instance, no jurisdictional impediments to that court's actions were raised.

The decision to grant or to deny a Rule 60(b)(2) motion is discretionary with the district court. *See Davis by Davis*, 912 F.2d at 132. Our review of such a decision, therefore, is solely to determine whether the court abused that discretion. *See id.* at 133. "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Id.* (citation omitted).

Alticor argues in this case that the more deferential abuse-of-discretion standard should not guide this court's review of this issue. In support of that contention, Alticor contends that resolution of the motion necessarily involved an interpretation of the Federal Rules of Civil Procedure, specifically, whether an amended complaint constitutes "newly discovered evidence, and that such interpretations are reviewed *de novo* by the appellate courts." We need not tarry over this standard-of-review disagreement, however. As discussed below, Alticor's attempt to distinguish this ruling from the "ordinary" 60(b) ruling is of no avail because both the less-restrained *de novo* review and the more deferential abuse-of-discretion review lead to the same result in this instance.

This circuit follows the "well-conceived rule that newly discovered evidence for motions under . . . Rule 60(b)(2) must pertain to evidence which existed at the time of trial." *Id.* at 136; 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE

-14-

AND PROCEDURE § 2859 (2d ed. 1995). Citing that "rule," the district court concluded that, because the *Nitro* plaintiffs' amended complaint in the Missouri action was filed *after* the entry of summary judgment in favor of National Union and Illinois National, the amended complaint could not be considered "evidence which existed at the time of trial" and that the defendants were thus not entitled to Rule 60(b)(2) relief.

Alticor argues, however, that "evidence falls within the rule as long as it pertain[s] to *facts* in existence at the time of the trial, and not to facts that have occurred subsequently." *Nat'l Anti-Hunger Coal. v. Executive Comm. of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1075 n.3 (D.C. Cir. 1983) (emphasis added) (internal quotation marks and citation omitted). Although Alticor's understanding of the black-letter law is correct, its application of that law to the facts of this particular case reveals a basic misunderstanding of the true scope of inquiry in the post-judgment proceedings. In *National Anti-Hunger Coalition*, our sister circuit considered certain task force reports to be "newly discovered evidence" even though those reports "did not come into existence until after the District Court's decision" because "they pertain[ed] to facts in existence at the time of that decision," and because it was the underlying facts themselves that were being challenged in the Rule 60(b) motion. *Id.*

The circumstances presently before us are not analogous to the *National Anti-Hunger Coalition* situation, however. Although the *facts* underlying both the *Nitro* plaintiffs' original complaint and the *Nitro* plaintiffs' amended complaint were in existence at the time of the district court's summary judgment decision, those facts are not the focus of our

-15-

specific inquiry. Instead, the determinative question before the district judge at the summary judgment stage was whether the *Nitro complaint* itself alleged facts that brought the suit within the coverage provisions of the relevant comprehensive general liability policy. Similarly, the Rule 60(b) motion was directed not to any newly-found *facts*, but rather to new allegations in a new *complaint*, a complaint that was filed almost exactly one year after the district court decision. Because the amended complaint – the instrument germane to the court's determination – clearly was not in existence at the time of the district court's entry of summary judgment, the district judge did not abuse his discretion or otherwise err in denying the Rule 60(b)(2) motion. Thus, whether we were to review that district court decision *de novo* or for an abuse of discretion, we would still be persuaded by "well-conceived" rules of law to reach the same conclusion.

## CONCLUSION

For the reasons set out above, we conclude that the district court appropriately determined that the *Nitro* plaintiffs' complaint in the federal district court in Missouri did not adequately allege that those plaintiffs were seeking damages "because of 'personal injury.'" Because that original complaint sought monetary relief for antitrust injury, the district court correctly ruled that Missouri action did not fall under the coverage provisions of the insurance policies at issue and that the insurers consequently bore no duty to defend or to indemnify Alticor. Moreover, the district judge correctly ruled that the amended complaint filed by the *Nitro* plaintiffs in the federal district court in Missouri did not constitute "newly discovered evidence" that could provide the defendants with relief from the district court's

-16-

grant of summary judgment to the insurers. We therefore AFFIRM the judgments of the district court in both case No. 05-2479 and case No. 06-2538.