# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 11, 2008          Decided June 27, 2008

No. 07-5023

CENTER FOR ARMS CONTROL AND NON-PROLIFERATION,
APPELLANT

v.

JOHN I. PRAY, JR., DEPUTY EXECUTIVE SECRETARY OF THE
NATIONAL SECURITY COUNCIL,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv00682)

———

*Jules Zacher* argued the cause and filed the briefs for
appellant.

*Alisa B. Klein*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With her on the brief were
*Jeffrey S. Bucholtz*, Acting Assistant Attorney General,
*Jeffrey A. Taylor*, U.S. Attorney, *Jonathan F. Cohn*, Deputy
Assistant Attorney General, and *Mark B. Stern*, Attorney. *R.
Craig Lawrence*, Assistant U.S. Attorney, entered an
appearance.

Before: GINSBURG, HENDERSON, and RANDOLPH, *Circuit
Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*:  The Center for Arms Control and Non-Proliferation claims the Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction violated the Federal Advisory Committee Act (FACA), Pub. L. No. 92-463, 86 Stat. 770 (1972) (codified at 5 U.S.C. app.), by refusing to make certain records publicly available.  The district court dismissed the case on the ground that the Commission is exempt from the FACA.  We agree and therefore affirm the judgment.

## I.    Background

President George W. Bush established the Commission in 2004 "for the purpose of advising the President ... in order to ensure the most effective counterproliferation capabilities of the United States and response to the September 11, 2001, terrorist attacks and the ongoing threat of terrorist activity." Exec. Order No. 13,328 §§ 1, 2(a), 69 Fed. Reg. 6901, 6901 (Feb. 6, 2004).  Chaired by Judge Laurence Silberman and former Senator Charles Robb, the Commission comprised a number of experts from the public and private sectors. Commission on the Intelligence Capabilities, Commissioners, *at* http://www.wmd.gov/commissioners.html.    After conducting a study, the Commission was to "submit to the President ... a report of [its] findings ... and its specific recommendations."  Exec. Order No. 13,328 § 2(d), 69 Fed. Reg. at 6902.    The President also instructed the Central Intelligence Agency and "other components of the Intelligence Community" to "utilize the Commission and its resulting report."  Exec. Order No. 13,328 § 2(d), 69 Fed. Reg. at 6902.

Concerned about disclosing sensitive information, the Commission closed its meetings to the public, *see, e.g.*,

Notice of Meeting of the Commission on the Intelligence Capabilities, 69 Fed. Reg. 31,820 (June 7, 2004), but made some efforts to inform the public of its activities. For example, after a meeting the Commission would release a public statement identifying some of the participants in the meeting and summarizing the issues discussed. *See, e.g.*, Joint Statement of the Co-Chairmen of the Commission on the Intelligence Capabilities, *at* http://www.wmd.gov/20040716.html (July 15, 2004). The Commission also maintained a public reading room, where it made available meeting agendas and summaries. On March 31, 2005 the Commission duly submitted to the President its report, the bulk of which was made publicly available. *See* Comm'n on the Intelligence Capabilities of the U.S. Regarding Weapons of Mass Destruction, *Report to the President of the United States*, xi (2005), *available at* http://www.wmd.gov/report/wmd_report.pdf.

Dissatisfied with the extent of the Commission's disclosures, the Center asked the Commission for the minutes of its meetings and for other records. Then, having received no response, the Center sued the Commission and its Executive Director, Vice Admiral (Ret.) John Scott Redd. The Center sought a declaration that the Commission and Redd had violated §§ 10(b), 10(c) and 11(a) of the FACA and a writ of mandamus compelling them to "publicly releas[e] ... all unclassified materials which are covered by" those sections of the Act.

While the case was pending, the Commission wound up its business, transferred legal custody of its records to the National Security Council (NSC), transferred physical custody of those records to the National Archives and Records Administration, and dissolved. Because the Commission no longer existed and Redd "no longer ha[d] authority or control over Commission documents," the district

court dismissed as moot the Center's claims against the Commission and Redd.

Shortly before that ruling, however, the Center, presumably in order to avert its looming mootness problem, joined as a defendant Stephen Hadley, the Assistant to the President for National Security Affairs, commonly referred to as the National Security Advisor. The Government moved to dismiss the claims against Hadley (for whom John I. Pray, Jr., Deputy Executive Secretary of the NSC, has since been substituted) on various grounds, two of which are relevant here. First, the Government contended the Commission came within the exemption from the FACA as provided in § 4(b)(1), for advisory committees "utilized by the Central Intelligence Agency." Second, the Government argued that, even if the Commission were not exempt, mandamus relief would not lie because "neither ... [Pray] nor the NSC has a duty to plaintiff under any of the three provisions of FACA on which plaintiff relies – let alone a 'clear and indisputable' and 'clear and compelling' duty that is 'free from doubt' – to make publicly available the former Commission's documents." *See, e.g.*, *Heckler v. Ringer*, 466 U.S. 602, 616 (1984) (writ of mandamus available "only if the defendant owes [plaintiff] a clear nondiscretionary duty").

The district court first determined that, unless the Commission was exempt from the FACA, mandamus relief would be appropriate because "[t]he issue is not the continued existence of the Commission; it is the continued existence of the documents." The court then granted the Government's motion to dismiss on the ground that the Commission was exempt from the FACA because it was "utilized by" the CIA. The court "read[] the word 'utilize' in FACA § 4(b) in accordance with its ordinary meaning: 'to put to use.'"

## II. Analysis

The Center contends the Commission is not exempt from the FACA. The Government, defending the district court's ruling, argues the Commission was exempt because it was "utilized by" the CIA. In the alternative, the Government argues, much as it did before the district court, that the Center is not entitled to mandamus relief because "the NSC had no ... specific and nondiscretionary duty to revisit the Commission's determinations as to which materials could properly be released."

We hold the Commission was exempt from the FACA. Accordingly, we do not address whether mandamus relief would otherwise be available.[*]

## A. The FACA

The Congress enacted the FACA in order "to control the establishment of advisory committees to the federal government and to allow the public to monitor their existence,

---

[*] The Government also asserts that the case is moot because the Center is not entitled to a writ of mandamus and "there is no proper defendant against whom declaratory relief can be awarded." We must, of course, determine the case is not moot and we have Article III jurisdiction before proceeding to the merits. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998). Even if the Center's claims against the Commission and its executive director became moot when the Commission relinquished custody of its records and ceased to exist, this case is not moot because, regardless whether mandamus relief is available, a declaration of the Center's legal right to the materials could form the basis of an injunction against the NSC, which would redress the Center's claimed injury. *See Cummock v. Gore*, 180 F.3d 282, 289-90, 292 (D.C. Cir. 1999); *Byrd v. EPA*, 174 F.3d 239, 243-45 (D.C. Cir. 1999).

activities, and cost." *Animal Legal Defense Fund v. Shalala*, 104 F.3d 424, 426 (1997); *see* FACA § 2. To those ends, the FACA requires the President, the relevant standing committees of the Congress, the relevant agency heads, and the Administrator of General Services to review the activities and finances of each advisory committee, and requires that the membership of each advisory committee "be fairly balanced in terms of point of view represented." FACA §§ 5-8; *see In re Cheney*, 406 F.3d 723, 727 (D.C. Cir. 2005) (en banc); *Nat'l Anti-Hunger Coal. v. Exec. Comm. of the President's Private Sector Survey of Cost Control*, 711 F.2d 1071, 1073 & n.1 (D.C. Cir. 1983) ("reject[ing] the ... contention that the 'fairly balanced' requirement ... is not binding on the President").

The FACA also imposes upon advisory committees a number of disclosure obligations, three of which the Center claims the Commission violated. Every advisory committee is required, under § 10(c) of the Act, to keep "[d]etailed minutes of each meeting," and, under § 11(a), to "make available to any person ... copies of transcripts of [its] meetings." In addition, § 10(b) provides

> the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection.

Pursuant to § 3(2) of the FACA, "any committee, board, commission," etc., qualifies as an "advisory committee" if it was

> (A) established by statute ..., (B) established or utilized by the President, or (C) established or utilized by one or more agencies, in the interest of obtaining advice or

recommendations for the President or one or more agencies or officers of the Federal Government.

We have on several occasions addressed the meaning of the term "utilized" in § 3(2) to determine whether a committee was subject to the requirements of the FACA. Although this case concerns the meaning of "utilized" in the provision of § 4 exempting from the FACA advisory committees "utilized by" the CIA, prior judicial interpretations of that term as used in § 3 bear upon our analysis of the exemption in § 4.

B.  "Utilized" in § 3

The seminal decision on the meaning of "utilized" in § 3 is *Public Citizen v. United States Department of Justice*, in which the Supreme Court held the Standing Committee on the Federal Judiciary of the American Bar Association was not "utilized" by the Department of Justice or by the President in the course of screening potential nominees for federal judgeships. 491 U.S. 440 (1989). The Court acknowledged that the Executive "utilized" the ABA Committee in the "common sense" meaning of the word, that is, to "make[] use of." *Id*. at 452. The Court was nonetheless reluctant to adopt the "unqualified[]" meaning of such a "woolly verb" as "utilized" because even a

> nodding acquaintance with FACA's purposes, as manifested by its legislative history and as recited in § 2 of the Act, reveals that it cannot have been Congress' intention ... to cover every formal and informal consultation between the President or an Executive agency and a group rendering advice.

*Id*. at 452-53. "Tip[ping] the balance decisively against" applying the FACA to the ABA Committee was the concern that doing so "would present formidable constitutional

difficulties," not the least of which would be "infring[ing] unduly on the President's Article II power to nominate federal judges and [thus] violat[ing] the doctrine of separation of powers." *Id.* at 465-66; *see also* U.S. CONST. art. II, § 2, cl. 2.

The Court's opinion was itself somewhat fuzzy when it came to the exact meaning of "utilized" in § 3 of the FACA. Subsequently, in *Animal Legal Defense Fund*, we determined, after examining *Public Citizen* and several of our own decisions made in such light as it shed, that a committee is "utilized" by the Executive for purposes of § 3 only if it is "amenable to ... strict management by" the Executive. *Public Citizen*, 491 U.S. at 457-58; *see Animal Legal Defense Fund*, 104 F.3d at 430-31 (discussing *Food Chem. News v. Young*, 900 F.2d 328, 333 (1990), and *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1450-51 (D.C. Cir. 1994)). We stressed that "the utilized test is a stringent standard, denoting something along the lines of actual management or control." *Animal Legal Defense Fund*, 104 F.3d at 430-31. (quotation marks and emphasis omitted); *see also Byrd v. EPA*, 174 F.3d 239, 245-48 (1999) ("participation by an agency or even an agency's significant influence over a committee's deliberations does not qualify as management and control such that the committee is utilized by the agency under FACA") (quotation marks omitted).

C.  "Utilized" in § 4

Section 4 of the FACA exempts from the Act "any advisory committee established or utilized ... by the Central Intelligence Agency." FACA § 4(b)(1). When it comes to this exemptive provision, the interpretive shoe is on the other foot: The broader the meaning of "utilized," the fewer the committees subject to the FACA. In reading § 4, therefore, the Government contends we should give "utilized" its "plain," that is, its broad meaning – "put to use" or, as the

Court put it in *Public Citizen*, "made use of."  For its part, the Center contends "utilized" in § 4 must have a narrow meaning, along the lines of that adopted in *Public Citizen* (and elaborated in our subsequent decisions) for purposes of § 3.   The Center, however, never proposes a specific definition or standard for determining whether a committee was "utilized," leaving it open for the Government to suggest the Center is claiming an advisory committee is exempt under § 4 only if it is under the "actual management or control" of the CIA.

In our view, neither the Government's broad interpretation of "utilized" nor the narrow interpretation it attributes to the Center is quite right for purposes of § 4.  In the end, however, we agree with the Government that the Commission was "utilized by" the CIA and hence was exempt from the FACA.

Our analysis begins but cannot end with competing canons of statutory interpretation.   In the Government's corner is the rule that "where ... the words of the statute are unambiguous, the judicial inquiry is complete."   *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (quotation marks omitted).  That can hardly be dispositive in view of the Supreme Court's having told us the term "utilized" in § 3 is not unambiguous but "woolly" and means something less encompassing than "made use of."  *Public Citizen*, 491 U.S. at 452.

On the Center's side is the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning," *Envtl. Def. v. Duke Energy Corp.*, 127 S. Ct. 1423, 1432 (2007) (quotation marks omitted), so that "utilized" in § 4 is no broader than the same term in § 3.   That presumption, however, "readily yields whenever there is such variation in the connection in which

the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Id.* (quotation marks omitted). This is just such a case: The Court's reasons for interpreting "utilized" narrowly in *Public Citizen* have no bearing upon the purpose of the CIA exemption in § 4. The Court interpreted "utilized" as it did in order to keep the FACA from interfering with the President's constitutional power to nominate federal judges. 491 U.S. at 465-67. There is simply no evident risk that interpreting "utilized" broadly for purposes of the CIA exemption in § 4 would interfere with the exercise of any power constitutionally assigned to the President; indeed, the Center suggests none.

The Congress obviously intended the exemption for advisory committees utilized by the CIA to ensure the FACA would not threaten the continued secrecy of the CIA's intelligence sources and methods, organization, or personnel, all of which the CIA is charged by law with protecting from disclosure. *See, e.g.*, 50 U.S.C. §§ 403-1(*i*), 403g. But for the exemption, the CIA's need for and statutory duty to ensure secrecy could preclude its using advisory committees altogether. The Congress obviously did not intend that result.

The meaning of "utilized" propounded by the Government is somewhat broader than necessary to fulfill the purpose of the exemption, so understood. As we said in *Sofamor Danek Group v. Gaus*, the Supreme Court in *Public Citizen* "made clear that mere subsequent and optional use of the work product of a committee by a federal entity does not involve utilization under [§ 3 of the] FACA," 61 F.3d 929, 933-37 (D.C. Cir. 1995); neither should it cloak that committee with the secrecy afforded by the exemption in § 4(b)(1). On the other hand, we agree with the Government that "the concerns that animated the CIA exemption" will not be adequately addressed if that exemption reaches only those

advisory committees over which "the CIA exercises actual management and control." Being under the CIA's management or control is surely a sufficient condition, but just as surely not a necessary condition, to bring an advisory committee within the exemption.

In fact, the Commission on the Intelligence Capabilities well illustrates why the exemption must reach some advisory committees that are not under the management or control of the CIA. The President charged the Commission with assessing whether the Intelligence Community, including the CIA, *see* Exec. Order No. 13,328 § 6(h), 69 Fed. Reg. at 6903; 50 U.S.C. § 401a(4)(B), is ready and able to identify and respond to the proliferation of weapons of mass destruction. Exec. Order No. 13,328 § 2(a), 69 Fed. Reg. at 6901. To that end, the Commission was to "examine the capabilities and challenges of the Intelligence Community to collect, process, analyze, produce, and disseminate information concerning" the proliferation and use of weapons of mass destruction. Exec. Order No. 13,328 § 2(a), 69 Fed. Reg. at 6901. The President "specifically" instructed the Commission to examine "intelligence" relating to Iraq, Libya, and Afghanistan, and to "evaluate the challenges of obtaining information" about the proliferation and use of weapons of mass destruction "in closed societies." Exec. Order No. 13,328 § 2(b)-(c), 69 Fed. Reg. at 6901-02. Not surprisingly, the Director of Central Intelligence was ordered to ensure Commission members obtained the necessary security clearances and the Commission adopted "security rules and procedures ... [that are] consistent with the national security and [that] protect against unauthorized disclosure of information." Exec. Order No. 13,328 § 5, 69 Fed. Reg. at 6902. In sum, the Commission's charge included reviewing the CIA's intelligence methods and organization, and possibly also its sources and personnel. The Commission, therefore, is

exactly the kind of advisory committee the Congress intended to exempt from the FACA.

The Center wonders whether exempting the Commission "mean[s] any[]time the CIA is mentioned in a Presidential order establishing a Presidential Commission that the FACA will not apply." We need not now fix the outer boundaries of the exemption because the Commission on the Intelligence Capabilities so clearly lies at its center: It was created by the President, who is primarily responsible for intelligence and national security matters, for the explicit purpose of examining and furnishing advice to the President, the CIA, and others in the Intelligence Community on issues relating to intelligence and national security.

Finally, our conclusion that the Commission was exempt from the FACA is supported by the rule that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones v. United States*, 526 U.S. 227, 239 (1999) (quotation marks omitted). The Government contends that if the Commission is not exempt, then the FACA may interfere with "the President's prerogatives to receive confidential advice." The Center responds, "It is difficult to see how turning over even one ... document [requested pursuant to FACA §§ 10(b)-(c) and 11(a)] is such an onerous burden on the executive branch as to call into question a separation of powers issue."

When the Legislature purports to affect the prerogatives of the President or his subordinates, we must ask whether it "impermissibly undermines the powers of the Executive Branch, or disrupts the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned functions."

13

*Morrison v. Olson*, 487 U.S. 654, 685 (1988) (quotation marks, alterations, and citation omitted). To answer that question, we compare the degree of interference in the Executive's function with the Congress's "need to promote objectives within [its] constitutional authority." *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 443 (1977); *see also Assoc. of Am. Physicians & Surgeons, Inc. v. Clinton (AAPS)*, 997 F.2d 898, 910 (D.C. Cir. 1993).

We have recognized that the FACA, at least as applied to "Presidential advisory committees," FACA § 3(4), could interfere with the President's need, "[i]n making decisions on personnel and policy, and in formulating legislative proposals, ... to seek confidential information from many sources, both inside the government and outside." *Cheney*, 406 F.3d at 728; *see also United States v. Nixon*, 418 U.S. 683, 705-06 (1974) ("the protection of the confidentiality of Presidential communications" "flow[s] from the nature of enumerated powers"); *AAPS*, 997 F.2d at 909. The "FACA was enacted to cure specific ills, above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals." *Public Citizen*, 491 U.S. at 453; *see* FACA § 2. Whatever the weight of the Congress's interest in regulating advisory committees generally, however, we strongly doubt the FACA could be applied to the Commission on the Intelligence Capabilities consistent with the constitutional separation of powers. *See Cheney*, 406 F.3d at 728 ("In light of the severe separation-of-powers problems in applying FACA on the basis that private parties participated in, or influenced, or were otherwise involved with a committee in the Executive Office of the President, we must construe the statute strictly"); *AAPS*, 997 F.2d at 910 ("A statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, ... raises Article II concerns").

The risk of impermissible interference is sharpened by the Commission's mandate to "advis[e] the President in the discharge of his constitutional authority under Article II of the Constitution to conduct foreign relations, protect national security, and command the Armed Forces of the United States." Exec. Order No. 13,328 § 2(a), 69 Fed. Reg. at 6901; *see also* U.S. CONST. art. II § 2, cl. 1-2 & § 3, cl.3; *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414-15 (2003); *Haig v. Agee*, 453 U.S. 280, 291-92 (1981). As the Supreme Court has observed, "[t]he President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world." *Nixon*, 418 U.S. at 710 (quotation marks omitted).

Subjecting the Commission on the Intelligence Capabilities to the requirements of the FACA would certainly interfere to some substantial degree with the President's exercise of these specific and important powers, and therefore raise grave and doubtful questions about the constitutionality of the statute, regardless whether it would require the disclosure of one document or many. Accordingly, our duty to favor the statutory interpretation that averts a constitutional collision between the Legislative and Executive Branches "solidifies" our conclusion that the Commission was "utilized" by the CIA and was therefore exempt from the FACA pursuant to § 4 of that Act. *Public Citizen*, 491 U.S. at 467.

III. Conclusion

In sum, we hold the Commission was exempt from the FACA because it was "utilized by" the CIA within the meaning of that term in § 4(b)(1) of the statute. The

judgment of the district court dismissing the Center's case is therefore

*Affirmed.*